Virginia WRIGHT and John
Wright, Respondents,

v.

W. Kent BARR, M.D., and Northland
Cardiology, P.C., Appellants.

No. WD 59067.

Missouri Court of Appeals,
Western District.

Oct. 23, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 4, 2001.

Application for Transfer Denied
Jan. 22, 2002.

514

Norman I. Reichel, Jr., Overland Park, KS, for appellants.

James M. Crabtree, Lenexa, KS, for respondents.

Before THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

THOMAS H. NEWTON, Judge.

W. Kent Barr, M.D., and Northland Cardiology, P.C. ("appellants") appeal a jury verdict in favor of Mrs. Virginia Wright and Mr. John Wright ("respondents"). Respondents' petition contained two counts. The first count alleged negligent treatment of Mrs. Wright's atrial fibrillation, which caused her to suffer a stroke, and the second count was a loss of consortium claim brought by Mr. Wright. Appellants were found negligent in failing to have an echocardiogram performed prior to administering an electrocardioversion and in failing to provide anticoagulant medications to ensure that clotting did not exist in Mrs. Wright's heart when electrocardioversion was performed.

Appellants raise six points on appeal. In Point I, they claim that the trial court erred in denying appellants' motion for directed verdict at the completion of respondents' evidence because respondents failed to prove causation and, thus, did not make a submissible case. Next, Points II and III assert that the trial court erred in giving Instruction No. 5, respondents' verdict director, because there was not substantial evidence to support the instruction. In Point IV, appellants argue that the trial court erred in allowing respondents' counsel to engage in numerous improper arguments to the jury. Appellants' fifth point asserts that the trial court erred in allowing the jury to award damages based on an exhibit prepared by respondents' expert because respondents' exhibit was based on matters not in evidence. Finally, appellants urge in their sixth point that the trial court erred in failing to conform the judgment pursuant to § 538.210, which places a cap on noneconomic damages.

We affirm.

## I. Background

In 1991, Virginia Wright suffered a heart attack, which typically occurs when a blood clot severely or totally blocks one of the coronary arteries that supplies blood to the heart muscle. "Thrombolytics," or clot busters, are the only medications currently available that can destroy an existing blood clot, and their use is reserved for the most extreme cases in which a clot is seriously obstructing blood flow to an area of the body, such as with a heart attack, stroke, or pulmonary embolism. To treat the heart attack, Mrs. Wright was given the clot buster "tissue plasminogen activa-

tor" ("t-PA"), and she subsequently developed damage to her kidneys. It was unclear whether the damage was caused by a blood clot going to her kidney, or if she had hemorrhaged.

In 1996, Mrs. Wright suffered a stroke. She had suffered from "atrial fibrillation" for many years. Atrial fibrillation is a very common type of "arrhythmia," which is an irregular heartbeat resulting from any change, deviation, or malfunction in the heart's electrical system. Atrial fibrillation got its name because the atria, the heart's upper chambers, quiver instead of contracting normally, resulting in an abnormally fast and highly irregular heartbeat.

Northland Cardiology is a general cardiology practice. The doctors there treat most cardiovascular problems, such as hypertension, congestive heart failure, and arrhythmias. They take care of patients with coronary artery disease and heart attack patients, and they recommend surgeries, procedures, and medications. In addition to atrial fibrillation, Mrs. Wright also suffered from hypertension and diabetes. With her heart problems, Mrs. Wright first became involved with Northland Cardiology by seeing Dr. James Ernest, who retired from the group in 1990. From 1990 through 1996, Mrs. Wright was seen at the Northland Cardiology office several times, and she was also seen at Trinity Lutheran Hospital by doctors from Northland Cardiology on at least two occasions. Dr. W. Kent Barr first became involved with Mrs. Wright's care in 1994 when he performed a stress test on her.

To treat atrial fibrillation, oral calcium channel blockers ("CCBs"), such as cardizem or verapamil, may be used to slow the heart rate. If necessary, a doctor may treat a patient in atrial fibrillation by using paddles to apply an electric shock to the patient and convert the patient's heart rhythm from atrial fibrillation to a normal rhythm, called sinus rhythm. This manner of restoring sinus rhythm is called "electrocardioversion" ("cardioversion").[1] Prior to her heart attack in 1991, Mrs. Wright had cardioversion performed by a doctor at the VA Hospital in Leavenworth, Kansas. She was given the CCB verapamil, which, according to the attending physician, caused her heart to stop. The doctor performed cardioversion to restart her heart, and she was then transferred to KU Medical Center, where she remained for approximately ten days.

Atrial fibrillation is a powerful risk factor for stroke, making people with atrial fibrillation six times more likely to have a stroke than people without. Because the atria are quivering instead of contracting, the blood flow through the heart slows when a person is in atrial fibrillation. When blood starts pooling in the atria ("stasis"), there is a pronounced risk of blood clots forming. There are two situations in which the blood clots can cause serious problems. First, the clots can be dangerous if they are large enough to block a blood vessel where they have formed ("thrombus"). Second, if either a whole clot or pieces of the clot break off, the clot may travel through the bloodstream and block a blood vessel in another part of the body ("embolism"). Either scenario can result in a heart attack or stroke.

Most strokes are caused by a lack of or restricted blood flow to the brain (an "ischemic stroke"), as opposed to by bleeding within or around the brain (a "hemorrhagic stroke"). An ischemic stroke results when brain does not get enough oxygen-rich blood, usually due to a blood clot that

1. Cardioversion may also be done through medication instead of electric shock.

is blocking an artery leading to the brain. The blood clot may have formed in an artery, causing a thrombotic stroke. Alternatively, a blood clot may have lodged in the artery after traveling through the bloodstream from another part of the body, which could cause an embolic stroke. A number of embolic strokes are a complication of stasis in the atria in people who have arrhythmias such as atrial fibrillation. In addition to atrial fibrillation, other risk factors for stroke include hypertension, diabetes, and bleeding disorders. These risk factors were present in Mrs. Wright.

On November 5, 1996, Mrs. Wright went to the emergency room at Liberty Hospital in Liberty, Missouri. Dr. Barr noted that she had a long-standing history of paroxysmal atrial fibrillation, or atrial fibrillation that came and went, and an electrocardiogram confirmed that she was in the irregular rhythm of atrial fibrillation. Dr. Barr placed Mrs. Wright on cardizem to slow her heart rate. Because the risk of stroke associated with atrial fibrillation may be reduced through the use of "anticoagulants" by preventing new blood clots from forming and keeping existing clots from growing larger, Dr. Barr also placed her on intravenous "heparin" with the intention of admitting her to the hospital. Warfarin, sold under the brand name "Coumadin," is the oral anticoagulant most frequently prescribed in cases of atrial fibrillation. While Coumadin takes several days to stop clots from forming, another type of anticoagulant, heparin, stops clotting almost immediately but only lasts for several hours. In addition, Mrs. Wright had already been taking aspirin regularly prior to that day. Aspirin is the most commonly used "antiplatelet." Antiplatelets are a type of anticoagulant that help prevent the formation of blood clots by reducing platelet viscosity and keeping platelets from binding together. Platelets are the body's natural blood-clotters. Dr.

Barr recommended continuing her on aspirin due to her past history of problems with Coumadin. On two occasions prior to November 1996, Mrs. Wright suffered from retinal hemorrhaging, or bleeding in the eye, associated with some vision impairment, and, as such, she discontinued using Coumadin. Dr. Barr was also aware of the effect that t-PA had on her kidneys in 1991. Thus, given her history, he felt that the risk of a hemorrhagic stroke outweighed any reduced risk of ischemic stroke by placing her on Coumadin. Consequently, intravenous heparin and aspirin were utilized instead of Coumadin.

Aspirin therapy may be used to effectively prevent many types of strokes. In fact, one study showed the risk of stroke was reduced from 6.3% per year in the placebo group to 3.6% per year for patients on aspirin, whereas the same study indicated a risk reduction from 7.4% per year in the placebo group to 2.3% in patients treated with warfarin. However, anticoagulation with warfarin has been found to be much more effective at reducing the risk of stroke in atrial fibrillation patients. Although aspirin is safer and easier to use that warfarin, aspirin is a poor alternative to anticoagulation with warfarin in atrial fibrillation patients.

Dr. Barr's partner at Northland Cardiology, Dr. Freund, took over Mrs. Wright's care the following day. After 36 hours in the hospital, her heart rate did not return to normal on its own. Guidelines published by the American College of Chest Physicians strongly recommend that oral anticoagulants, such as warfarin or Coumadin, be given for three weeks before elective cardioversion in patients who have been in atrial fibrillation for more than two days. The guidelines also provide that the administration of anticoagulants should be continued until sinus rhythm has been maintained for four weeks. The American

College of Physicians and the American Heart Association have similar guidelines. These guidelines are intended to minimize the risk of heart attack or stroke by allowing the medication to prevent clotting and to control the clots already formed prior to performing cardioversion. Some articles and medical texts, however, state that anticoagulation for three weeks is considered unnecessary if atrial fibrillation has been present for less than three days, in which case heparin should be started in anticipation of cardioversion to avoid formation of thrombus. Dr. Freund determined that she should undergo an elective cardioversion because she had been in atrial fibrillation for less than 48 hours. After Dr. Freund cardioverted her, Mrs. Wright was successfully converted into sinus rhythm, and she was continued on aspirin after her discharge on November 6.

On November 11, 1996, Mr. or Mrs. Wright called Northland Cardiology due to concerns about her blood pressure. A nurse took the call, and, after the nurse discussed the situation with Dr. Barr, Mrs. Wright was told to come into the Northland Cardiology office. There, she was seen by Dr. Bogart, who noted in his report that she had remained in sinus rhythm since discharged on November 6.

In the morning hours of Friday, November 15, 1996, Mrs. Wright went back into atrial fibrillation. She called Northland Cardiology and spoke with Dr. Freund. Mrs. Wright was told to wait and see if she would convert back into sinus rhythm on her own. If she did not convert on her own, she was to call back on Sunday. Mrs. Wright agreed and apparently preferred this "wait and see" approach as opposed to a hospital visit. Later that same day, Northland Cardiology learned that it was acceptable to place Mrs. Wright on Coumadin. Mrs. Wright had seen a retinal specialist, Dr. Rosenthal. Dr. Rosenthal called the Northland Cardiology office and conveyed that he did not feel that her risk of using Coumadin was excessive. Dr. Freund discussed the use of Coumadin with Mrs. Wright, and she agreed.

On Sunday, November 17, 1996, Mrs. Wright had not converted to sinus rhythm on her own. She made the telephone call and spoke to Dr. Barr, who was on call at the hospital that day. He directed her to the hospital. She arrived at North Kansas City Hospital after she had been in atrial fibrillation for more than 48 hours. Because she had been on aspirin and had been given heparin a week and a half before, Dr. Barr believed that Mrs. Wright was on appropriate therapy, and he performed cardioversion to relieve her atrial fibrillation.

Mrs. Wright had been in atrial fibrillation for 55 hours. Although she was still on aspirin and was given Coumadin just prior to the cardioversion, Mrs. Wright was not on Coumadin or any other oral anticoagulants for any prolonged period in advance of the procedure. Regardless, neither anticoagulants nor antiplatelets dissolve existing clots. In order to detect existing blood clots, a "transesophageal echocardiogram" ("TEE") may be used. An echocardiogram is a noninvasive or minimally invasive procedure that uses high-frequency sound waves ("ultrasound") to measure the structure and function of the heart. A device called a transducer emits and receives the ultrasound signals. The sound waves bounce back from the heart's chambers and valves, producing images and sounds that can be used by the physician to detect damage or disease. With a TEE, a transducer is inserted down the patient's throat into the esophagus, producing very clear images of the heart structures and valves obtained from the inside of the body without the interfer-

ence of the chest wall and lungs. By obtaining this information from the TEE, the physician may identify blood clots. No attempt was made to detect clots in her heart through the use of a TEE.

Dr. Barr discharged Mrs. Wright that same day on Coumadin and verapamil. Mrs. Wright suffered a debilitating ischemic stroke the next day. A TEE demonstrated a clot in her left atrium. She was treated with t-PA, maintained on heparin, and placed on Coumadin. Five days later, on November 22, she had a second stroke. Almost three years later, in September of 1999, Mrs. Wright suffered another heart attack.

On November 13, 1998, Mr. and Mrs. Wright filed suit against the appellants. Mrs. Wright claimed negligence by appellants, contending that the medical care and treatment provided was negligent and caused her stroke on November 18, 1996. Mr. Wright's claim was a loss of consortium claim. On June 26, 2000, the case came before the Honorable David W. Russell for jury trial.

At trial, the medical expert for Mr. and Mrs. Wright was Dr. Ira Ehrlich, a board-certified cardiologist in practice for over thirty years and a graduate of Harvard Medical School. Dr. Ehrlich testified regarding the standard of care. He had "no doubt whatsoever" that Mrs. Wright had clotting in her heart at the time of the cardioversion. He testified that it was 98% certain that her stroke was caused by a clot that formed in her left atrium, dislodged from her heart, and was sent to her brain. Dr. Ehrlich further testified that Dr. Barr should have ordered a TEE to detect clotting before proceeding with cardioversion, and, if a TEE showed clotting, the risk of stroke would have been about 80%. Dr. Ehrlich testified that it was more likely than not that she would not have suffered a stroke had she been treated with the appropriate standard of care. In his opinion, the stroke was caused by the deviation from the standard of care by Dr. Barr. Dr. Ehrlich testified that Dr. Barr was negligent in proceeding with the cardioversion without anticoagulating Mrs. Wright first and without attempting to detect clotting with a TEE. Furthermore, reading Dr. Barr's deposition, Dr. Ehrlich testified that Dr. Barr stated that he and his partners at Northland Cardiology had a basic rule that they did not believe it was safe to perform cardioversion on someone who had been in atrial fibrillation for 48 hours or more. Consistent with the guidelines set forth by the American College of Chest Physicians, Dr. Ehrlich testified, in pertinent part, regarding the appropriate standard of care as follows:

Q. Are the opinions that you will express in this case all opinions based on— to a degree of reasonable medical certainty?

A. Yes.

Q. In using the term negligence on standard of care, will you use this term "negligence" or "negligent" to mean the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the [appellant's] profession? Will you use that definition?

A. I will.

Q. Have you formed an opinion whether Dr. Barr and Northland Cardiology Corporation failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession.

A. Yes.

Q. And what is your opinion?

A. I am not fond of the word "negligent" but I think that under that definition, the care given to Mrs. Wright was under that definition of negligent.

Q. Did you form an opinion whether the negligence of the doctor caused her to have a stroke?

A. Yes.

Q. And what is your opinion?

A. I think that the patient's stroke did result from the care that she was given.

Q. And did you form an opinion whether the stroke that she had has caused her permanent, life-changing injury?

A. Yes.

Q. And what is your opinion?

A. It has.

Q. I'd like to take each of those opinions and have you explain them to the jury. First of all with regard to negligence, would you explain to the jury why you believe that Dr. Barr and his corporation were negligent and how this woman should have been treated applying an appropriate degree of care?

A. This is going to take a little while so relax back in your seats. I think that you have probably been introduced to the term atrial fibrillation which is a heart rhythm disturbance which causes the heart to beat grossly irregularly. In doing so, the upper chambers of the heart lose their ability to squeeze, and the blood that's sitting in the upper chambers of the heart sits there in sort of a pooling and not very rapidly moving fashion.

*When you get this sort of pooling and what we call stasis, there is a tendency for the heart to form clots in the upper chambers of the heart. It was one of those clots that broke lose [sic] on Mrs. Wright and caused the stroke that we're discussing today.*

* * *

*In Mrs. Wright's case, as I commented, she had multiple risk factors for the development of clots and the breaking off of clots. Most important-ly, she had done it before.* Now the past history of embolization—as I say, I've been in practice for a little over thirty years. I can go back to the days twenty-five years ago when we were dealing with this kind of disease, and the only risk factor that we recognized in those days was a past history of clots being thrown off. Twenty-five years ago we knew that if the patient had a past history of embolization, that we needed to look upon that as a real danger sign and that patient needed to be anticoagulated.

* * *

In Mrs. Wright's case, she had risk factors with the exception of diabetes, the most important one being the past history of clots. Furthermore, we also know that she had just been cardioverted a week and a half before. She had a long history of episodes of atrial fibrillation. A week and a half before, she had been cardioverted out of atrial fibrillation into sinus rhythm. She only stayed in sinus rhythm for a week and a half, and she was back in atrial fibrillation again.

It's incumbent upon the doctor who is dealing with this to look at this and say, "You know, if I convert her today, what's the likelihood that she's going to stay in sinus rhythm unless I do something different to create a situation where she will stay in sinus rhythm." There are medications that you can use that will lessen the odds of her going back into atrial fibrillation. As I commented before, eventually she will. Eventually she will be in atrial fibrillation chronically.

But if I'm going to try one more cardioversion on this lady, I want to do it under circumstances in which I think it's going to last—I think it's going to last

for more than a week and a half and I won't be dealing with this again.

*So in my opinion—and I say this as [respondents' counsel] said, with a degree of medical certainty—that the way you handle a patient like Mrs. Wright is you put her on anticoagulants first and foremost to prevent these clots from forming, to allow the clots that are already there to do what we call organize, become firm so they won't break off, new clots won't form, and you keep her anticoagulated for a period of three to four weeks.*

Before such time as you then go to convert her, three or four weeks down the line, you put her on some medication which will prevent a recurrence of the atrial fibrillation when she comes out of atrial fibrillation into sinus rhythm. That in Mrs. Wright had been a bit of a problem in the past in that she had been relatively intolerant to this type of medication in the past, but there are newer agents, and these newer agents were available in this particular year, 1996, that could have been tried to do that.

You know that if she can't tolerate any of those medications, she's going to go back into atrial fibrillation. No question about that in anybody's mind. She's going to go back into atrial fibrillation, and she'll do it fairly soon.

So if she can't tolerate any of those medications, there is no point in even cardioverting her. You just keep her on anticoagulants and leave her in atrial fibrillation, controlling her rate and controlling the rhythm.

But it was worth, I think, one try to do it with antiarrhythmic medication in place to try to prevent her from going back into atrial fibrillation. So that in my eyes is the way a patient like this needs to be treated. You then maximize the benefit. You get the patient converted. You maximize the benefit by using something that will keep her in the nice regular rhythm, and *you minimize the risk by anticoagulating the patient so that a clot will not—you don't assure it, but a clot very likely will not occur and will not be broken off at the time of her conversion.*

(Emphasis added). On cross-examination, Dr. Ehrlich testified, in relevant part:

Q. With cardioversion at 55 hours that we have with Mrs. Wright, what is your opinion as to the risk of stroke at that point in time that it was done?

A. *In this particular patient?*

Q. Yes, sir.

A. *With these particular risk factors?*

Q. Yes, sir.

A. And what did her TEE show?

Q. I'm asking you what was done at that point in time. What was reality?

A. Reality is one hundred percent.

Q. I'm talking about prospectively. If you were sitting there as a doctor looking prospectively, what would be the risk or percentage of stroke at 55 hours?

A. *I would never even attempt to make that judgment without a TEE.*

Q. Do you have the capability of telling what the risk of stroke was at 55 hours?

A. One hundred percent.

Q. So you say that it was a one hundred percent risk of stroke at this cardioversion at 55 hours?

A. Obviously. She had a stroke. *If you ask me without a transesophageal echo to estimate that, I will tell you that I won't estimate without a transesophageal echo because I believe that's the standard of care. If she had a transesophageal echo which was completely normal with no suspicion of any clot whatsoever, then I would think that you would have an accept-*

*able risk of somewhere in the neighborhood of five percent. If she had a transesophageal echo which showed clot, then I would say that your risk is probably 80 percent.*

Q. With regard to 48 hours, if we take the ACP—from a general standpoint of a patient at 48 hours, what would be the risk of stroke at that point in time under the American College Physician guidelines?

A. The American College of Chest Physicians?

Q. Chest Physicians.

A. Again, *in this patient?*

Q. Yes.

A. Again, *I wouldn't answer that without a TEE.*

Q. *So in this patient, you would go beyond what the guidelines say and would have done a TEE in this patient?*

A. *Yes. As I think I said in my deposition, I would not have felt comfortable in cardioverting this patient unanticoagulated at 48 hours given her past history of embolization and all her other risk factors. I would not have done that.*

Q. So you say it would be 100 percent at 48 hours?

A. What does the TEE show?

Q. At 48 hours—

A. You asked me if I think she would have embolized at 48 hours. Yes, I think she would have embolized at 48 hours.

Q. So you believe sitting here looking back retrospectively that there would have been a 100 percent chance?

A. I don't think that the seven hours would have made a whole lot of difference. *I think that this particular patient—guidelines are for large groups of patients. You have to look at the*

*patient you're dealing with. In this particular patient, a 48 hour distance is too long.*

Q. So if I understand you correctly then based on your testimony, seven hours under this set of circumstances made no difference?

A. I don't know whether it did or didn't.

Q. That's what—

A. It may well not have. *I would not have cardioverted this patient at 48 hours without a TEE.*

Q. Just so I understand you, in viewing the 48 hour guideline given this set of facts in this situation, in essence you believe that that seven hours didn't make a difference because you believe it should have been done at 24?

A. *I believe it should have been done at 24.*

Q. So that seven hours according to guidelines really makes no difference here in this situation?

A. It may have made a tremendous difference. We don't know, but *I think past 24 hours, you are not allowed to do this lady without doing a TEE beforehand.*

(Emphasis added).

Appellants' experts, on the other hand, asserted that the guidelines are not rigid, that the time allowed for cardioversion without prior anticoagulation varies depending on the individual patient, which could be more or less than 48 hours, and that clotting in the atria can occur after cardioversion. Dr. Baldwin testified by deposition that the stroke was probably not caused by the cardioversion performed by Dr. Barr. Dr. Baldwin felt that it was unlikely that the clot was present when the cardioversion was performed, and he attributed only a small chance of likelihood that a clot was present from the cardiover-

sion performed two weeks before. He noted that people do sometimes have strokes days or weeks after cardioversion, and he believed that the stroke-causing clot formed after Dr. Barr's cardioversion. Dr. Baldwin also stated that it was unlikely that the clot resulted from Dr. Freund's cardioversion and remained in her left atrium for more than a week. In addition, Dr. Kevin Mulhern testified live on behalf of appellants, and he stated that Dr. Barr's decision process, Dr. Barr's performance of the cardioversion, and Dr. Barr's method and medications utilized all met the standard of care.

Respondents called Kathie Allison as an expert to testify regarding Mrs. Wright's costs for life care planning. She testified that, due to the stroke, Mrs. Wright has swallowing difficulties, complete paralysis on one side of her body, and a very compromised ability to communicate her needs. She testified that Mrs. Wright requires 24–hour care, needs assistance in managing bowel and bladder care, and should use a chair lift for ascending and descending the stairs at her home. Ms. Allison also testified that Mrs. Wright is unable to get in or out of bed, get in or out of a car, or get in or out of a chair independently. With other activities such as feeding, grooming, bathing, and dressing, however, Mrs. Wright is at what Ms. Allison considered a minimum need of assistance. Ms. Allison testified that, in order for Mrs. Wright to be cared for at home, the house would have to be adapted for safety purposes and for speed in an emergency situation. Mrs. Wright would also require a scooter to allow her to be socially active while relieving Mr. Wright, who had suffered a heart attack himself, from the burden of pushing Mrs. Wright.

Respondents also read the deposition testimony of Dr. Ward Zimmerman. Dr. Zimmerman reviewed the life care plan prepared by Ms. Allison and prepared a report determining the present value of the future needs of Mrs. Wright caused by the stroke. One table of the report, the summary chart, was admitted into evidence after appellants' counsel agreed not to object and respondents' counsel agreed not to seek admission of the entire report.

At the end of respondents' evidence, appellants moved for a directed verdict, which was denied. Counsel for appellants read into evidence Mr. Wright's deposition testimony, which discussed the cardioversion performed two weeks earlier by Dr. Freund and the risk of stroke associated with that earlier cardioversion. Dr. Barr testified about Dr. Freund's treatment of Mrs. Wright after the prior cardioversion, stating that she was not prescribed Coumadin and was instead only on aspirin. Dr. Barr testified that clots can develop following cardioversion. Further, Dr. Barr testified that Mrs. Wright suffered a subsequent stroke on November 27, 1996, despite being fully anti-coagulated after she was placed on Coumadin.

The jury returned a verdict in favor of Mr. and Mrs. Wright and against Dr. Barr and Northland Cardiology. As required by § 538.215,[2] damages were itemized as follows. Mrs. Virginia Wright was awarded $108,013.76 for past economic damages including past medical damages; $200,000.00 for past noneconomic damages; $491,464.00 for future medical damages; and $120.000.00 for future noneconomic damages. Mr. John Wright was awarded $200,000 for past noneconomic damages, and $100,000 for future noneconomic damages. In all, Virginia Wright was awarded $919,477.76, and John Wright was awarded $300,000.00. This appeal followed.

**2.** Unless otherwise indicated, all statutory references are to RSMo 2000.

## II. Legal Analysis

### A. Submissibility of the Case

In the first point, appellants argue that the trial court erred in denying their motion for directed verdict at the completion of respondents' evidence because respondents did not make a submissible case. Similar standards govern motions for directed verdict and for *judgment non obstante veredicto,* or a judgment notwithstanding the verdict (JNOV). If granted, a motion for directed verdict allows the trial court to take a case from the jury and enter judgment for the movant. A post-trial motion for JNOV requires the trial court to reconsider the legal basis for denying the motion for directed verdict. Rule 72.01(b).[3] Consequently, appellate review of the denial of a motion for JNOV is essentially the same as that for the denial of a motion for a directed verdict. *Giddens v. Kansas City S. Ry. Co.,* 29 S.W.3d 813, 818 (Mo. banc 2000).

When reviewing the denial of a motion for directed verdict, we view the evidence and permissible inferences in the light most favorable to the plaintiff and disregard any conflicting evidence and inferences, and we determine whether the plaintiff has made a submissible case. *Gorman v. Walmart Stores, Inc.,* 19 S.W.3d 725, 732 (Mo.App. W.D.2000). A motion for directed verdict should be granted only when there is no room for reasonable minds to differ; otherwise, the case should not be withdrawn from the jury. *Id.* This matter is a question of law, which we review *de novo. Id.*

Appellants assert that respondents failed to make a submissible case because they did not prove that Dr. Barr's conduct caused Mrs. Wright's injury. They state that respondents failed to demonstrate that "but for" the alleged negligence of Dr. Barr, injury would not have occurred. Appellants also argue that respondents failed to demonstrate Dr. Barr's alleged conduct was the proximate cause of Mrs. Wright's stroke. Further, they argue, if respondents demonstrated *any* right to recovery, it should be only under a "lost chance of recovery" theory.

To establish causation, a plaintiff must show both the cause in fact and the proximate or legal cause of the plaintiff's injury. *Robinson v. Mo. State Highway and Transp. Comm'n,* 24 S.W.3d 67, 77 (Mo.App. W.D.2000). The cause in fact is determined by asking whether the plaintiff's injury would not have occurred but for the defendant's conduct, and a defendant's conduct is also the proximate cause of the plaintiff's injury if the injury complained of was the natural and probable consequence of the defendant's conduct. *Guffey v. Integrated Health Servs. of Kansas City at Alpine N.,* 1 S.W.3d 509, 518 (Mo.App. W.D.1999). The trier of fact will normally decide causation, especially where reasonable minds could differ. *Robinson,* 24 S.W.3d at 77.

If there is a sophisticated injury, one that requires surgical intervention or other highly scientific techniques for diagnosis, expert medical testimony is required to prove causation. *Portis v. Greenhaw,* 38 S.W.3d 436, 441 (Mo.App. W.D.2001). Consequently, expert medical testimony is necessary to establish causation "except where the want of skill or lack of care is so apparent as to require only common knowledge and experience to understand and judge it." *Super v. White,* 18 S.W.3d 511, 516 (Mo.App. W.D.2000)

---

**3.** All rule references are to Missouri Rules of Civil Procedure (2000) unless otherwise noted.

(quoting *Tillman by Tillman v. Elrod,* 897 S.W.2d 116, 118 (Mo.App. S.D.1995)). When the plaintiff relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of medical certainty. *Id.*

■ Here, given the nature of the facts underlying respondents' causes of action, expert medical testimony was clearly needed to show the elements of their claims. In summary, Dr. Ehrlich testified that he had "no doubt whatsoever" that Mrs. Wright had clots in her heart when Dr. Barr performed the cardioversion, that performing cardioversion on Mrs. Wright caused one of these clots to become dislodged, and that he was about "98 percent" certain that Mrs. Wright's stroke was caused by a clot dislodging from her atrium and going to her brain as a result of Dr. Barr's shocking of her heart. . Thus, there was sufficient evidence to establish within a reasonable degree of medical certainty that Dr. Barr's actions were the cause in fact of Mrs. Wright's stroke. Further, Dr. Ehrlich testified that Mrs. Wright's stroke was the natural and probable consequence of performing cardioversion under the circumstances, making Dr. Barr's conduct the proximate cause of the medical condition. Thus, there was sufficient evidence of causation.

■ Appellants' final contention is that any recovery by respondents should have been limited to a "lost chance of recovery" theory. *See Wollen v. DePaul Health Ctr.,* 828 S.W.2d 681, 683 (Mo. banc 1992). Appellants' argument is without merit. *Wollen* explains that lost chance of recovery is a cause of action in the following circumstances:

Doctors have a treatment that works in a large number of cases and fails in a large number of cases. Because there is a real chance that the patient will survive and a real chance that the patient will die from the disease—even if it is diagnosed—it is impossible for a medical expert to state with "reasonable medical certainty" the effect of the failure to diagnose on a specific patient, other than the fact that the failure to diagnose eliminated whatever chance the patient would have had.

*Id.* at 682. Here, there was no failure to diagnose Mrs. Wright's atrial fibrillation and the concomitant risk of clotting and subsequent stroke. Therefore, a "lost chance of recovery" theory is simply not applicable to this case.

Point I is denied.

### B. Submission of Instruction No. 5

Appellants next raise two points on appeal regarding the trial court's submission of Instruction No. 5, which provided:

Your verdict must be for the plaintiff, Virginia Wright, and against the Defendants if you believe:

First, W. Kent Barr either:

1) failed to order a T.E.E. prior to performing cardioversion on Virginia Wright on 11/17/96 to look for a blood clot; or

2) performed a cardioversion on Virginia Wright without anti-coagulating her or

3) failed to recognize that 55 hours after the onset of atrial fibrillation was too late to cardiovert a patient with all of the risk factors for clot present in plaintiff, and

Second, W. Kent Barr was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damages to Virginia Wright.

In Point II, appellants claim that there was not substantial evidence to support

each disjunctive alternative submitted because respondents' expert, Dr. Ehrlich testified in his *personal* opinion (1) that Dr. Barr should have ordered a TEE prior to performing cardioversion on Mrs. Wright, and (2) that Dr. Barr failed to recognize that 55 hours after the onset of atrial fibrillation was too late to cardiovert her. Point III states that there was not substantial evidence to support the instruction because respondents did not plead the "multiple cause of damage" theory and the evidence at trial did not support a submission upon such theory.

Jury instructions must be supported by substantial evidence. *Deckard v. O'Reilly Auto., Inc.*, 31 S.W.3d 6, 17 (Mo.App. W.D.2000). If an instruction provides for disjunctive alternatives, each alternative submitted must be supported by substantial evidence. *Id.* at 18. "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Med. Ctr., Inc.*, 709 S.W.2d 872, 880 (Mo. App. W.D.1985). The issue of whether the jury was properly instructed is a question of law with little deference given to the trial court's decision. *Deckard*, 31 S.W.3d at 18. However, we review the evidence and inferences in a light most favorable to the submission of the instruction, disregarding all contrary evidence and inferences. *Id.*

### 1. Disjunctive Alternatives

Insofar as appellants claim that Dr. Ehrlich's testimony was based on his personal opinion, their argument is essentially one as to foundation, and, therefore, it is critical that appellants made no objection at trial to Dr. Ehrlich's testimony. Where testimony is challenged on the basis of sufficient foundation, the challenge is one of admissibility, and such challenges must be raised by a timely objection or a

motion to strike. *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995). Appellants made no such objection or motion at trial. "It is particularly important that where an inadequate foundation has been laid for admission of evidence that the objection made be specific as such foundation deficiencies can frequently be remedied. We will not review the contention of inadequate foundation raised for the first time on appeal." *State v. Blue*, 875 S.W.2d 632, 633 (Mo. App. E.D.1994) (quoting *State v. Jones*, 569 S.W.2d 15, 16 (Mo.App.1978)). "The only objections to evidence that can be considered on appeal are those that were properly raised in the trial court." *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 650 (Mo. banc 1997). Therefore, by not specifically and timely objecting to the testimony, appellants have not preserved for review their claim that Dr. Ehrlich testified based on his personal opinion. With Dr. Ehrlich's testimony admitted, we find that substantial evidence existed to support the submission of the instruction.

### a. The first disjunctive

Appellants assert that there was not substantial evidence for the disjunctive alternative that Dr. Barr was negligent in failing to order a TEE prior to performing cardioversion. Appellants' attack on the submissibility of this alternative is twofold. First, they argue that respondents failed to make a proper "but for" case for the causation element of this disjunctive allegation of negligence. Second, appellants also contend that there was no competent testimony that Dr. Barr fell below the standard of care.

Appellants objected to the instruction at trial on the grounds that the first alternative of fault and negligence were "overly broad and [did] not specifically track the testimony of [respondents'] expert, and

therefore are improper." On appeal, appellants refer to the following portions of Dr. Ehrlich's testimony on direct examination:

Q. Is there any doubt in your mind that she had clots in her heart at the time the paddles were put on her and her heart shocked?

A. There is no doubt whatsoever in my mind that she had clots in her heart. She did.

Q. How do you know that?

A. Because of what happened subsequently, her stroke the following day, and because of the transesophageal echocardiogram done later which demonstrated a defect in that heart which was a clot in the left atrium.

Appellants also note that Dr. Ehrlich made the following concessions on cross-examination: (1) clots can form after cardioversion, (2) cardioversion itself has a risk of an embolic event such as stroke of 1 to 3 percent, (3) he did not know if a clot was present at the time of cardioversion, and (4) he could not determine the presence, size or nature of a clot at 24, 48, or 72 hours of atrial fibrillation. Based on this, appellants contend that respondents failed to make a proper "but for" case for the first disjunctive alternative because whether a clot was present and would have been found by a TEE were based on speculation and conjecture on Dr. Ehrlich's part.

■ Before proceeding any further, we note that the third "concession" appellants point out was actually made in reference to the cardioversion performed by Dr. Freund on November 5th, and, likewise, the statement Dr. Ehrlich made with regard to the fourth "concession" was that he could not determine what *size* the clot might have been at 24, 48, or 72 hours of atrial fibrillation. With the first two "concessions" in mind, appellants refer us to *Hurlock v. Park Lane Medical Center,* *Inc.,* 709 S.W.2d 872 (Mo.App. W.D.1985) for the proposition that, "where evidence equally supporting two inconsistent and contradictory factual inferences as to ultimate and determinative facts is solely relied on to make a submissible case, there is a failure of proof as the case has not been removed from the tenuous status of speculation, conjecture and surmise." *Id.* at 880.

■ Dr. Ehrlich's testimony did not support two inconsistent and contradictory factual inferences. He unequivocally testified that, if a doctor thought it was necessary to do the cardioversion under the circumstances of November 16, it was incumbent upon the doctor to consider the likelihood of clotting before performing an elective cardioversion. In addition, both Dr. Barr and Dr. Mulhern agreed that a reasonable and prudent doctor should consider the likelihood of clots in the heart before performing an elective cardioversion. Moreover, Dr. Barr testified that, "[i]f she had thrombus, yes, I would not have proceeded with cardioversion." Thus, we find that there was substantial evidence to support the submission of the first disjunctive alternative. Dr. Ehrlich had "no doubt whatsoever" that Mrs. Wright had clots in her heart at the time of Dr. Barr's cardioversion. Even with a TEE that comes back normal, a risk of clots being present still exists. If Dr. Barr had ordered a TEE that showed clotting, he would not have proceeded with cardioversion. Therefore, viewing the testimony in the light most favorable to the submission of the instruction, had Dr. Barr ordered a TEE, the results would have revealed clotting, and he would not have proceeded with cardioversion. But for his failure to order a TEE, he would not have subjected Mrs. Wright to a greatly increased risk of stroke by cardioverting her with a clot present in her heart. Thus, the

case was removed from the tenuous status of speculation, conjecture, and surmise.

 Appellants also rely on *Ladish v. Gordon*, 879 S.W.2d 623 (Mo.App. W.D. 1994). In *Ladish*, the cross-examination of the plaintiff's expert "completely negated" the witness' opinion on direct examination that the defendant's actions fell below the standard of care. *Id.* at 632. Accordingly, we held that the particular disjunctive alternative of negligence was not submissible, and the trial court correctly found that the submission was not supported by the evidence. *Id.* at 633. Drawing a parallel, appellants conclude their discussion of *Ladish* with an assertion that Dr. Ehrlich's opinions were completely negated to the point that there was no competent evidence that Dr. Barr fell below the standard of care. However, appellants arrive at this legal conclusion without showing how the principles of law and the facts of the case interact, and, therefore, they have failed to develop this line of argument. *See Christomos v. Holiday Inn Branson*, 26 S.W.3d 485, 487 (Mo.App. S.D.2000). Accordingly, this portion of appellants' second point is deemed abandoned because it is not supported by argument and not preserved for appellate review. *Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App. E.D.1996).

### b. The second disjunctive

 Appellants do not challenge whether substantial evidence existed to support the submission of the second disjunctive alternative. Although appellants' point claims that there was not substantial evidence to support the disjunctive alternatives contained in Instruction No. 5, nowhere in their brief do they specifically claim error in regard to the second disjunctive alternative. A contention raised in the point relied on must be developed in the argument section of the brief. *Id.* Arguments raised in the points relied on that are not supported by argument in the argument portion of the brief are deemed abandoned and present nothing for appellate review. *Id.*

### c. The third disjunctive

 Appellants objected to the third disjunctive alternative at the instruction conference because it was "not restricted sufficiently in time and does not track the [respondents'] expert's testimony." Dr. Ehrlich's opinions were stated to a degree of reasonable medical certainty. He testified that the deviation from the standard of care was Dr. Barr's failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession. Dr. Ehrlich testified that he would not have proceeded after 24 hours without a TEE, but he also testified that the standard recognized by the American Heart Association and the American College of Chest Physicians was 48 hours.

Appellants direct this court's attention to *Mills v. Redington*, 736 S.W.2d 522 (Mo.App. E.D.1987). In *Mills*, this court's Eastern District indicated:

> Mere evidence that the conduct of a physician or surgeon did not measure up to the standards of an individual member of the profession, as opposed to the standards of the profession at large, does not constitute substantial evidence of probative force to support a submission of negligence in a medical malpractice case as individual standards may be higher or lower than the profession as a whole.

*Id.* at 524. However, appellants disregard the fact that Dr. Ehrlich's opinions as to a recommended course of treatment and cardiologists' standard of care were based on facts known to him at or before the trial that others in the field would reasonably rely upon in forming an opinion. He testi-

fied that, regardless of the guidelines, a physician needs to evaluate the patient as an individual, and, with Mrs. Wright and the circumstances that existed on November 16, 1996, the standard of care dictated that cardioversion should not have been performed at that time.

Thus, there was substantial evidence to support the disjunctive alternatives submitted in Instruction No. 5. While appellants presented evidence to impeach Dr. Ehrlich, the jury sided with Dr. Ehrlich. Point II is denied.

### 2. "Multiple Cause of Damage" Theory

Appellants also argue in their third point that the trial court erred in giving Instruction No. 5 because there was not substantial evidence to support the instruction in that respondents did not plead the "multiple cause of damage" theory, nor did the evidence at trial support a submission upon such theory. Appellants point out that respondents alleged in their petition that Dr. Barr was negligent and that his negligence directly caused or resulted in Mrs. Wright's injuries and damages. Appellants argue that, because they did not plead that Dr. Barr's alleged negligence "directly caused or directly contributed to cause" the damages, the instruction was improper.

The trial court must use a Missouri Approved Instruction if it is applicable to a particular case. Rule 70.02(b). A requesting party is entitled to use the MAI 19.01 modification language if the evidence shows a preexisting injury. *Higby v. Wein,* 996 S.W.2d 95, 99 (Mo.App. E.D. 1999). A requesting party is also entitled to use the MAI 19.01 modification language "in cases in which there are multiple causes of damage but which may not involve another party or tortfeasor." MAI 19.01, Committee Comment (1995).

When appellants objected to the verdict directing instruction as modified by MAI 19.01 to include the language "directly contributed to cause" on the basis that there was no issue of comparative fault or multiple causes in evidence, the Court responded as follows:

I am somewhat concerned about "directly caused" or "directly contributed to cause" however plaintiff has convinced the Court that there is the issue of two clots involved in this matter, that apparently either one or both led to the stoke, and also there is the issue of the overall illness and the fragility, if I can put it that way, of the plaintiff which could have been a factor in the eyes of the jury. So I am convinced by the plaintiff to let them use the "contributed to cause" phrase.

Viewing the evidence in the light most favorable to the instruction, the record reveals the following. Dr. Barr performed cardioversion on Mrs. Wright on November 17, 1996, without the use of anticoagulants and without use of a TEE after she had been in atrial fibrillation for 55 hours. The following day, on November 18, Mrs. Wright suffered a stroke caused by a blood clot that formed in her left atrium, dislodged, and went to her brain. Dr. Ehrlich testified that Mrs. Wright had a heart attack before the stroke, that she had a heart attack after the stroke, and that she suffered from high blood pressure. He also testified that he believed the stroke to have been caused by Dr. Barr's cardioversion. Dr. Ehrlich testified that there was a risk of stroke associated with Mrs. Wright's atrial fibrillation, regardless of the treatment she received, and that the cardioversion itself presents a risk of stroke. There was also testimonial evidence that alluded to the possibility of multiple blood clots. At no point did respondents contend, nor does the evidence

reasonably suggest, that the clot that caused Mrs. Wright's stroke developed as the result of any conduct by appellants. Thus, there was evidence that Mrs. Wright had preexisting conditions that made her more susceptible to stroke.

 Unquestionably, Mr. and Mrs. Wright's theory, which was substantiated by the evidence, was as follows. Thrombus was present, for whatever reason, before Dr. Barr performed cardioversion on Mrs. Wright. Despite her health problems and concomitant risk of stroke, her risk of stroke could have been minimized if Dr. Barr ordered a TEE and anticoagulated her prior to performing cardioversion. Under the circumstances, the standard of care required Dr. Barr to order a TEE and to anticoagulate Mrs. Wright. "[A] party is entitled to have his own theory of the case submitted to the jury by instructions, provided the instructions are within the pleadings and evidence and are correct in both form and substance." *Orloff v. Fondaw*, 315 S.W.2d 430, 433 (Mo.App. 1958). "The failure to submit an instruction to which a party is entitled is error, and will warrant reversal when the merits of the action have been materially affected." *Allison v. Sverdrup & Parcel and Assocs., Inc.*, 738 S.W.2d 440, 454 (Mo.App. E.D. 1987) (citing *Orloff*, 315 S.W.2d at 434).

The record supports the submission to the jury of the issue of whether any negligence of Dr. Barr in performing the cardioversion directly caused or directly contributed to cause Mrs. Wright's stroke on November 18, 1996. The testimony brought out evidence of Mrs. Wright's prior and subsequent injuries, her subsequent stroke, and the cardioversion performed by Dr. Freund two weeks earlier. The evidence highlighted the fact that Mrs. Wright was at risk of suffering a stroke regardless of whether Dr. Barr performed cardioversion on her that day. Further, there was testimony to the effect that the stroke-causing clot could have formed before or after Dr. Barr's cardioversion, and there was even some evidence suggesting that multiple clots could have been involved. Thus, the jury could have inferred that Dr. Barr was not completely at fault because he did not bring about the stroke-causing clot and because Mrs. Wright already had a significant risk of stroke.

This is a classic "two fires" case. *See Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862–63 & n. 1 (Mo. banc 1993). On the one hand, Mrs. Wright suffered from several health conditions that placed her at a high risk of suffering a stroke, while, on the other, Dr. Barr's deviation from the standard of care placed her at a much higher risk of stroke. The Supreme Court of Missouri succinctly articulated the appropriateness of the MAI 19.01 modification language in this situation:

> All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under MAI we do not use the terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury that the defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury.

*Id.* at 863 (citing MAI 19.01). Therefore, in light of the evidence, respondents were entitled, upon their request, to modification of the verdict directing instruction in accordance with MAI 19.01.

Point III is denied.

## C. Arguments of Respondents' Counsel

Appellants' fourth point alleges that several arguments made by respondents' counsel were inappropriate and invoked prejudice in the minds of the jurors toward Dr. Barr. Specifically, appellants believe

that counsel's argument in opening statement that Dr. Barr's treatment constituted "Russian roulette" was an improper and prejudicial appeal to passion and prejudice, and further constituted an argument on matters not in issue. They claim that counsel improperly and prejudicially stated in closing argument that the jury should consider the salaries of professional sports figures in determining the amount of respondents' damages. They argue that counsel improperly and prejudicially argued in closing that the case would not affect Dr. Barr because he makes $400,000 to $600,000 per year. They insist that counsel improperly argued a negative inference from appellants' failure to call their former partner, Dr. Freund, or appellants' current partners. They maintain that counsel improperly and prejudicially injected the issue of respondents' poverty, which was not supported by the evidence. Appellants also aver that counsel improperly and prejudicially argued in closing that appellants' counsel was a "master of confusion" and that he had tried over one hundred cases. They believe that counsel referred to the fact that he did not object during appellants' closing argument in an attempt to arouse sympathy for the respondents and invoke prejudice toward appellants. Finally, appellants argue that counsel improperly and prejudicially argued a theory of corporate negligence and corporate accountability/responsibility when these issues were not at issue.

Appellants specifically protest the following statements of respondents' counsel in closing argument. "His [Dr. Barr's] own partner didn't come to court." "They'll [Mr. and Mrs. Wright] have to pay back Medicare off the top of this when it's done. I think it's $108,000 or something like that, but you'll have that number." "He is the absolutely [sic] master of confusion, absolutely. Defense of a case of this type all over the place is 'let's see if

we can confuse this enough to say that the burden of proof has not been met.' That's how [appellants' counsel] defends doctors in these cases. 'Let's see if we can confuse the issues.'" "He's tried over a hundred of these cases." "I didn't object. I just sat there because that's what I do during closing argument." "Ladies and gentlemen, we're here seeking personal and corporate accountability for the acts of the healthcare provider that caused irreversible brain damage to my client, Virginia Wright." "Northland Cardiology doesn't like being a defendant. I understand that. But this is a place for accountability." "I told you in voir dire that the defendants would not admit responsibility, and they don't want to be accountable." "Let him [appellants' counsel] tell you because he knows what is fair as well as I do. I'm offering him the opportunity on behalf of the medical corporation to tell you. They're never going to admit their responsibility." Appellants insist that the trial court's allowance of these comments constituted reversible error.

■ We disagree. Appellants did not raise an objection to these statements, and, consequently, these claims can only be reviewed for plain error. *Van Volkenburgh v. McBride*, 2 S.W.3d 814, 819 (Mo. App. W.D.1999). Plain error review is proper only if we find that "the error has affected the parties' rights so substantially that a miscarriage of justice or manifest injustice would occur if the error were left uncorrected." *Id.* Such objections would have allowed the trial court to take action to avoid undue prejudice. *Id.* By not objecting to these statements, the trial court was denied any opportunity to take remedial action, and, as such, appellants have waived their claims of error by failing to properly preserve them, except as plain error. *Id.*

This court has discretion in granting plain error review. *Coleman v. Gilyard*, 969 S.W.2d 271, 274 (Mo.App. W.D.1998). We will review a claim for plain error only if it "facially establishes substantial grounds for believing that a 'manifest injustice or a miscarriage of justice' would result if left uncorrected." *Id.* (quoting *Brown v. Mercantile Bank of Poplar Bluff*, 820 S.W.2d 327, 335 (Mo. App. S.D.1991)). "Plain error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections." *Guess v. Escobar*, 26 S.W.3d 235, 241 (Mo. App. W.D.2000) (citations omitted). Under the plain error standard, parties will rarely be entitled to relief for comments made during closing argument. *Morgan Publ'ns, Inc. v. Squire Publishers, Inc.*, 26 S.W.3d 164, 170 (Mo.App. W.D.2000). "[I]n the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons*, 753 S.W.2d 901, 907–08 (Mo. banc 1988).

The lack of objection to each of the disputed statements can be viewed in two ways: as the belief of appellants' counsel that the remarks did not warrant an objection because they were of little consequence, or as a trial strategy to set the stage for built in error. *State v. Wood*, 719 S.W.2d 756, 760 (Mo. banc 1986). "A party cannot play a game of chance by failing to object to the alleged misconduct or trial error and then expect appellate review if the result proves unfavorable." *French v. Mo. Highway and Transp. Comm'n*, 908 S.W.2d 146, 153 (Mo.App. W.D.1995). Whatever the reason for counsel's failure to object, we find no merit in appellants' claim that the comments of the respondent's counsel in any way changed the outcome of this case, and we decline to exercise our discretion to grant plain error review.

The remaining remarks, however, did receive objections and were raised in their motion for a new trial. In respondents' opening statement, counsel stated, in pertinent part:

> [Respondents' counsel]: But if you give them the safety of a TEE and the anticoagulants, less than one would have a stroke. In other words, there is a six times increased likelihood of stroke to do this procedure without the safety of those tests. That's why the doctors who set the standards and perform the standards say if you suspect a clot in a patient, *you don't play Russian roulette with her health and hope that—*
>
> [Appellants' counsel]: Your, Honor. I'm going to object. He's arguing his case.
>
> THE COURT: Overruled.
>
> [Respondents' counsel]: You don't just hope they don't have a stroke. You take the reasonable safety precautions to ensure that they don't.

(Emphasis added).

We review the trial court's ruling in opening statement for abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 607 (Mo. banc 2000). Counsel's statement was not improper. Mr. and Mrs. Wright alleged that Dr. Barr was negligent in treating Mrs. Wright because he failed to perform a TEE and did not provide her with anticoagulant medications to ensure a clot did not exist in her heart when cardioversion was performed. One of the purposes of opening statement is to outline for the court and the jury the anticipated evidence so that they can better understand the case. *State v. Johns*, 34 S.W.3d 93, 110 (Mo. banc 2000). Counsel is permitted great latitude in making an opening statement. *Giles v. Am. Fam-*

*ily Life Ins. Co.*, 987 S.W.2d 490, 493 (Mo.App. W.D.1999). Here, the disputed statement related to respondents' belief that the standard of care was to anticoagulate the patient and to do a TEE to look for a clot before cardioverting, thereby significantly reducing the risk of stroke, and this position was supported by evidence at trial. Counsel's Russian roulette remark in opening statement was not improper because it placed before the jury and the defense the theory of their case. *See White v. State*, 939 S.W.2d 887, 902 (Mo. banc 1997), *cert. denied* 522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997). Thus, the trial court did not abuse its discretion.[4]

The final two statements that appellants claim were improper and prejudicial were made in closing argument and arose as follows:

[Respondents' counsel]: Life shouldn't be as hard for these folks as it's going to be. For the last however many years they have, they're going to live like you saw in that video, and it's not necessary.

How do you come up with a number for that? If I were doing it, what I would do is I would say $500,000 for John and $500,000 for her. That's not a ton of money in today's world. It's truly not. *We're talking about people who make four, five, and six—*

[Appellants' counsel]: Objection, Your Honor. That's improper.

THE COURT: Sustained.

[Respondents' counsel]: In today's world, things are measured in large dollars. If you can read the news, you can make two or three million dollars a year. Or *if you can hit a baseball, you're*

*going to make ten million dollars a year.*

[Appellants' counsel]: Your Honor, objection. Improper argument.

THE COURT: Overruled.

[Respondents' counsel]: You be the voice of our community. Whatever you say, that'll be it. But I've known [appellants' counsel] for some time. He's tried over a hundred of these cases. I'd like him to get up here and look you folks in the face and say the damage done to Virginia Wright and the damage done to John Wright and to their marriage and to their live is worth whatever. Let him tell you because he knows what is fair as well as I do. I'm offering him the opportunity on behalf of the medical corporation to tell you. They're never going to admit their responsibility. They can certainly say when a man's life is ruined what it's worth.

(Emphasis added).

■■■ Considering the first italicized statement, appellants argue that respondents' counsel was suggesting that the outcome of the case would not affect Dr. Barr because he makes $400,000 to $600,000 per year. First, it would be improper for us to infer that respondents' counsel would have concluded as indicated by appellants. Secondly, appellants' objection to this challenged statement was sustained by the trial court. Appellants did not, however, at any time request a mistrial with respect to these comments. "A party may not assert as error that the trial court failed to do more than was requested." *Wulfing v. Kansas City S. Indus., Inc.*, 842 S.W.2d 133, 159 (Mo.App. W.D.1992). As such, because their objection was sustained and no further remedial action was requested,

4. Appellants' brief argues that the trial court's allowance of counsel's statement constituted plain error. Appellants cite no case supporting the proposition that a trial court's overrul-

ing of an objection to a remark made in opening statement, which does not constitute an abuse of discretion, nonetheless rises to the level of plain error.

appellants have preserved nothing for appellate review. *See Coats v. Hickman*, 11 S.W.3d 798, 805 (Mo.App. W.D.1999). Thus, any review of appellants' claim as to this challenged portion of the respondents' closing argument would also be for plain error. *Id.* "As a practical matter, we rarely resort to plain error review in civil cases. We are even more reluctant to review an appellant's claim for plain error in a civil case where an objection was sustained and no further relief was requested." *Id.* (citations omitted). Again, we decline to grant plain error review.

■ Appellants argue that, by making second italicized statement, respondents' counsel improperly and prejudicially stated that the jury should consider the salaries of professional sports figures when determining the amount of damages that Mr. and Mrs. Wright should be entitled to. "Determining the prejudicial effect of final argument is a matter within the discretion of the trial court, and the trial court's judgment on that matter will not be disturbed unless there was an abuse of discretion." *Hoover's Dairy, Inc. v. Mid–Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 434 (Mo. banc 1985). After quoting the objected to statement, the portion of appellants' brief dedicated to this issue reads, in its entirety:

> [Appellants'] counsel objected as an improper argument, but the Court overruled counsel's objection. [Respondents'] counsel, by making this statement, improperly and prejudicially stated that the jury should consider the salaries of professional sports figures when determining the amount of damages that the [respondents] should be entitled to. Such an argument is clearly improper and prejudicial.

In *Moore v. Missouri Pacific R. Co.*, 825 S.W.2d 839 (Mo.1992), the Court stated that "when there is no evidence to justify, it is always improper for counsel to indulge an argument to the jury which tends towards the prejudice of one party or to the undue sympathy for the other." In the case at bar, [respondents'] counsel urged the jury to refer to the salaries of professional athletes in determining the amount of damages to be awarded [Mr. and Mrs. Wright]. As such, [respondents'] counsel's argument was clearly improper, prejudicial and reversible error which warrants a new trial.

(References to the transcript omitted). Appellants attempt to demonstrate how the statement was prejudicial is not persuasive. Absent any showing of prejudice by appellants, we are not inclined to suppose that the trial court abused its discretion.

In light of the foregoing principles of law and given the circumstances of this case, we refuse to grant plain error review to those statements that were not properly preserved for appellate review. As for the two statements preserved for review, the first merely placed before the jury and the defense the theory of their case, while appellants have failed to demonstrate any prejudice with regard to the second. Overall, we cannot say that the challenged comments in any way changed the outcome of this case so as to warrant a new trial.

Point IV is denied.

### D. Future Pecuniary Losses

■ Appellants claim that the award of $491,000 for future pecuniary losses to the respondents is against the weight of the evidence and not founded on any competent evidence. Further, appellants claim that the award was based on matters not in evidence, *i.e.* the summary of Dr. Zimmerman's report. Appellants agreed to allow the chart to be admitted, and their

claim of error is fundamentally a claim of insufficient foundation. Inasmuch as appellants failed to object when the evidence was presented, appellants have failed to preserve the matter for appellate review. *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 587 (Mo.App. S.D.1999). We decline to grant plain error review.

Point V is denied.

### E. Noneconomic Damages Cap

Less than a month after the trial court entered its judgment on the jury's verdict, appellants filed a motion asking the trial court to reduce the amount of noneconomic damages to the Wrights from $620,000.00 to $528,000.00 pursuant to § 538.210. This motion was overruled. Appellants claim on appeal that Dr. Barr and Northland Cardiology constitute a single defendant pursuant to § 538.210 because Dr. Barr was insured as an employee under Northland Cardiology's insurance policy. Further, because Mr. Wright's consortium claim is derivative of Mrs. Wright's claim, appellants assert that they constitute one plaintiff under § 538.210. Accordingly, appellants claim that the judgment should conform with the statutory cap on noneconomic damages.

Appellants rely solely on *Vincent by Vincent v. Johnson,* 833 S.W.2d 859 (Mo. banc 1992) for their position. In that case, our Supreme Court considered whether there are one or two "defendants" under § 538.210, which provides, in pertinent part:

1. In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for noneconomic damages from any one defendant as defendant is defined in subsection 2 of this section.

2. "Defendant" for purposes of sections 538.205 to 538.230 shall be defined as:

(1) A hospital as defined in chapter 197, RSMo, and its employees and physician employees who are insured under the hospital's professional liability insurance policy or the hospital's self-insurance maintained for professional liability purposes;

(2) A physician, including his non-physician employees who are insured under the physician's professional liability insurance or under the physician's self-insurance maintained for professional liability purposes;

(3) Any other health care provider having the legal capacity to sue and be sued and who is not included in subdivisions (1) and (2) of this subsection, including employees of any health care providers who are insured under the health care provider's professional liability insurance policy or self-insurance maintained for professional liability purposes.

\* \* \*

4. The limitation on awards for noneconomic damages provided for in this section shall be increased or decreased on an annual basis effective January first of each year in accordance with the Implicit Price Deflator for Personal Consumption Expenditures as published by the Bureau of Economic Analysis of the United States Department of Commerce. The current value of the limitation shall be calculated by the director of the division of insurance, who shall furnish that value to the secretary of state, who shall publish such value in the Missouri Register as soon after each January first as practicable, but it shall otherwise be exempt from the provisions of section 536.021, RSMo.

§ 538.210. This statutory cap was upheld in *Adams By and Through Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898, 904–05 (Mo. banc 1992). In addressing an equal protection challenge to the statute, our Supreme Court of Missouri found that this statutory limitation was rationally related to the state's interest in preserving public health and maintaining generally affordable health care costs:

> The legislature could rationally believe that the cap on noneconomic damages would work to reduce in the aggregate the amount of damage awards for medical malpractice and, thereby, reduce malpractice insurance premiums paid by health care providers. Were this to result, the legislature could reason, physicians would be willing to continue "high risk" medical practices in Missouri and provide quality medical services at a less expensive level than would otherwise be the case.

*Id.* at 904.

*Vincent* reaffirmed that "the general purpose of chapter 538 is to reduce the cost of medical malpractice." *Vincent*, 833 S.W.2d at 867. The court held that the number of defendants under § 538.210(2) turns on whether the doctor was insured as an employee under the hospital's malpractice insurance policy. *Id.* at 864. Assuming that appellants are correct in their assertion that Dr. Barr was insured under Northland Cardiology's malpractice insurance policy, we have no difficulty recognizing the applicability of *Vincent.* However, *Vincent* does not assist our determination of whether there are one or two "plaintiffs" under § 538.210.

The interpretation of the § 538.210 in this situation is an issue of first impression, and, therefore, we must carefully examine the statute in order to determine "the intent of the legislature from the language used, to give effect to

that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Farmers' & Laborers' Coop. Ins. Ass'n v. Dir. of Revenue*, 742 S.W.2d 141, 145 (Mo. banc 1987); *see Mickey v. City Wide Maint.*, 996 S.W.2d 144, 148 (Mo.App. W.D.1999) (quoting *Betz v. Columbia Tel. Co.*, 224 Mo.App. 1004, 24 S.W.2d 224, 228 (1930)). When deciding whether a statute is clear and unambiguous so as to ascertain the intent of the legislature, the appellate court must consider whether the language is plain and clear to a person of ordinary intelligence. *Wheeler v. Bd. of Police Comm'rs of Kansas City*, 918 S.W.2d 800, 803 (Mo.App. W.D.1996) (citing *Wolff Shoe Co. v. Dir. of Revenue*, 762 S.W.2d 29, 31 (Mo. banc 1988)). Only when the language is ambiguous or if its plain meaning would lead to an illogical result will the court look past the plain and ordinary meaning of a statute. *Id.*

Chapter 538, *Tort Actions Based on Improper Health Care,* does not define "plaintiff." Thus, we must attribute to the term "plaintiff" its plain and ordinary meaning. *See Coomes v. Slater Dev. Corp.*, 36 S.W.3d 412, 416 (Mo.App. W.D.2001). A "plaintiff" is defined as "[a] person who brings an action; the party who complains or sues in a civil action and is so named on the record." Black's Law Dictionary 1150 (6th ed.1990). Thus, there is no need to look beyond the plain and ordinary meaning of the statute for the definition of a plaintiff.

Although the statutory language is unambiguous on its face, appellants argue that, because Mr. Wright's claim is based on loss of consortium and is, therefore, derivative of Mrs. Wright's negligence claim, they nonetheless comprise a single plaintiff. Two separate and distinct causes of action can result from an injury to a married person. *H.R.B. v. J.L.G.*, 913 S.W.2d 92, 99 (Mo.App. E.D.1995). The

first, of course, belongs to the person who sustained the injuries, and a claim also rests with his or her spouse. *Id.* A claim for loss of consortium is derivative of the injured spouse's claim, which means "the defendant must be proved to have caused the original injury, which in turn caused the spouse to suffer." *Burke v. L & J Food and Liquor, Inc.*, 945 S.W.2d 662, 664 (Mo.App. W.D.1997). Thus, it is axiomatic that one spouse may not be awarded damages for loss of consortium if the other is not injured, although one spouse suffering injuries does not automatically entitle the other to damages for loss of consortium. *M.C. v. Yeargin*, 11 S.W.3d 604, 614 (Mo.App. E.D.1999). The claim encompasses the other spouse's loss of affection, care, companionship, and services, as well as an impairment or destruction of the sexual life of the married couple, due to the conduct of a tortfeasor. *H.R.B.*, 913 S.W.2d at 99; *Powell v. Am. Motors Corp.*, 834 S.W.2d 184, 188 (Mo. banc 1992); *Novak v. Kansas City Transit, Inc.*, 365 S.W.2d 539, 543 (Mo. banc 1963). The loss of consortium claim must be filed in conjunction with the claim of the injured spouse. Rule 66.01(d).

The key, therefore, to appellants' sixth point is that Missouri recognizes a loss of consortium claim as a separate and distinct personal injury claim. *M.C.*, 11 S.W.3d at 614; *Burke*, 945 S.W.2d at 664; *Cragin v. Lobbey*, 537 S.W.2d 193, 195 (Mo.App. 1976); *Stahlheber v. Am. Cyanamid Co.*, 451 S.W.2d 48, 64 (Mo.1970). Under Missouri law, Mr. Wright's claim was a separate personal injury claim. Thus, under the plain and ordinary meaning of "plaintiff" used in § 538.210, Mr. Wright was a second plaintiff.

There is, however, another statutory source that could possibly serve to cap the noneconomic damages in this case as appellants suggest. Section 538.205 defines "noneconomic damages" as "damages aris-

ing from nonpecuniary harm including, without limitation, pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium" and does not include punitive damages. § 538.205(7). One might consider that the General Assembly intended for a single cap to apply to the individual claim of an injured person and the derivative loss of consortium claim. By including "loss of consortium" within the § 538.205 definition of noneconomic damages, the amount of noneconomic damages recoverable in a personal injury action with a loss of consortium claim would be effectively doubled, thereby frustrating the General Assembly's purpose in enacting § 538.210.

Such a line of reasoning is flawed. This approach fails to recognize that a claim for loss of consortium is a separate and distinct cause of action. In Missouri, the damages sustained by a person claiming loss of consortium are different from those of the injured spouse. *Stahlheber*, 451 S.W.2d at 64. To lump the spouse's right to noneconomic damages together with the noneconomic damages of the injured spouse would be to define the injury sustained as one to the marital unit as a whole, which it clearly is *not* under Missouri law, rather than as an injury to the spouse of the injured person. Contemplated within an award of noneconomic damages to the injured person is his or her *personal* loss of affection, care, companionship, services, or sexual life due to the injury. § 538.205(7). The injured person's spouse, on the other hand, suffers uniquely from a similar, yet quite different, *personal* loss of affection, care, companionship, services, or sexual life due to the injury, and it follows that it should not be subject to the same cap as that of the person's spouse. *See Stahlheber*, 451 S.W.2d at 64.

Accordingly, Mr. Wright brought a separate action for loss of consortium, and he,

too, was named as a "plaintiff" on the record. So, there were actually two plaintiffs in this case. The nature of Mr. Wright's claim as a derivative of Mrs. Wright's claim does not require that the awards of noneconomic damages to each be considered as a whole under § 538.210. The statutory cap applies separately to the two separate claims because the plain statutory language dictates that the cap applies per plaintiff.

Point VI is denied.

## III. Conclusion

Based on a thorough review of the record, the judgment of the trial court is affirmed.

HAROLD L. LOWENSTEIN, Judge and JAMES M. SMART, JR., Judge, concur.