Jimmie Lee **DAVOLT**, Respondent,

v.

**Dr. Thomas HIGHLAND, Appellant.**

**No. WD 60590.**

Missouri Court of Appeals,
Western District.

Aug. 12, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 30, 2003.

Application for Transfer Denied
Nov. 25, 2003.

Mark T. McCloskey, Clayton, MO, for Respondent.

Susan Ford Robertson, Columbia, MO, for Appellant.

Before BRECKENRIDGE, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

Jimmie Davolt sued Dr. Thomas Highland for medical malpractice. A jury found in favor of Mr. Davolt and awarded $700,000 in total damages.

Dr. Highland brings four points of error in his appeal from the amended judgment entered upon the jury's verdict. He alleges that the trial court erred: (1) in denying his motion for directed verdict and judgment notwithstanding the verdict (JNOV); (2) in denying admission of a videotape demonstration of the surgical procedure at issue; (3) in admitting Mr. Davolt's expert's letters to Mr. Davolt's counsel—Plaintiff's Exhibits 4 and 5—into evidence and thereafter allowing the exhibits to go to the jury during deliberations; and (4) in computing periodic payments of future damages under section 538.220.[1]

We affirm.

**Background**

Jimmie Davolt worked as an electroplater at Toastmaster in Macon, Missouri. On July 18, 1991, while shoveling hazardous waste, Mr. Davolt "fell flat to the floor." He immediately "felt tingling and burning in [his] arms and legs and [his] neck and all through [his] back." After seeing several doctors, it was determined that he required neck surgery, so he was referred to Dr. Highland, an orthopedic surgeon in Columbia, Missouri.

Dr. Highland performed surgery on Mr. Davolt's neck on October 4, 1991. After four days in the hospital, Mr. Davolt returned home. He was still experiencing constant numbness, tingling and burning sensations—"like needles and pins"—in his arms and legs. At his monthly follow-up appointments with Dr. Highland, Mr. Davolt complained that he "felt the same" as he did before the surgery. Although he was told he could return to work three months after the surgery, Mr. Davolt did not feel he could, so he requested a second myelogram.[2] Upon receiving results of the myelogram, Dr. Highland recommended additional surgery. However, Mr. Davolt refused to consent to the surgery and chose, instead, to pursue other doctors' opinions about his condition. After consulting with the other doctors, Mr. Davolt decided not to have a second surgery, because, as he explained, it "would be a lot worse—chance of paralysis."

Mr. Davolt then filed his medical malpractice action against Dr. Highland.[3] A three-day jury trial was held in July 2001,

1. Unless otherwise noted, statutory references are to the Mo.Rev.Stat. (2000).

2. Trial testimony showed that during a "myelogram" a contrast dye is injected into the spinal column—the space between the sac and the cord itself—and an x-ray is taken to allow visualization of the structures of the spinal cord and nerve roots.

3. After the jury returned its verdict, the court explained, "[y]ou may wonder why the case has taken so long to hear. And I'll just briefly tell you that it was filed once and dismissed, with another attorney involved in the case. Present attorney who conducted the case took it over and was able to refile the case."

at which both parties presented extensive medical testimony and evidence pertaining to Mr. Davolt's condition and the surgical procedure performed by Dr. Highland. Dr. Dunn, Mr. Davolt's expert witness, testified that Dr. Highland had negligently performed an incomplete decompression of Mr. Davolt's spinal cord and nerve roots by failing to completely remove the bone spurs or osteophytes from Mr. Davolt's vertebrae, resulting in his ongoing symptoms. Dr. Highland's defense was that he had properly performed a complete decompression, but Mr. Davolt's injury from the fall in 1991 was permanent, so there was nothing he could do to relieve the ongoing symptoms. At midnight on Saturday, July 13, 2001, the jury[4] entered its verdict in favor of Mr. Davolt. It found his total damages to be $700,000.[5] The trial court thereafter entered its judgment subject to the adjudication or agreement upon periodic payments, if any, of future damages pursuant to section 538.220.

Dr. Highland then filed his post-trial motions, including: a motion for JNOV; a motion to vacate, reopen, correct, amend or modify the judgment; a motion for new trial; and an alternate motion for remittitur. Mr. Davolt filed his opposition to the post-trial motions the following month. Dr. Highland and Mr. Davolt then filed suggestions in support of an amended judgment concerning periodic payments of future damages under section 538.220. Although they agreed amendment was necessary as to certain aspects of the periodic payment, they did not agree on the aggregate sum subject to periodic payments, so both parties suggested calculations for the proposed amended judgment. The trial court entered an amended judgment on October 15, 2001. This appeal follows.

## Point I: "But For" Causation

In his first point on appeal, Dr. Highland contends that the trial court erred in denying his motion for a directed verdict and motion for JNOV because there was no substantial evidence of "but for" causation sufficient to support submission of Mr. Davolt's case to the jury. He maintains that Mr. Davolt failed to provide evidence of a causal relationship between Dr. Highland's alleged negligent failure to perform a complete decompression and Mr. Davolt's damages. We disagree.

## I. Standard of Review:

■■■ We review the trial court's denials of Dr. Highland's motion for directed verdict and motion for JNOV under the same standard. In both cases, we must determine whether Mr. Davolt made a submissible case, i.e., whether he "presented substantial evidence for every fact essential to liability." *Poloski v. Wal–Mart Stores, Inc.*, 68 S.W.3d 445, 448 (Mo.App. W.D.2001). To make a submissible case in his medical malpractice action, Mr. Davolt must have presented substantial evidence that Dr. Highland "failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of [Dr. Highland's] profession and that his negligent act or acts caused [Mr. Davolt's] injury." *Coon v. Dryden*, 46 S.W.3d 81, 89 (Mo.App. W.D.2001). Unless we find that "there is a 'complete absence of probative fact' to support the jury's conclusion," or, in other words, that the evidence and reasonable inferences are

---

**4.** The verdict is signed by nine of the twelve jurors.

**5.** Specifically, the jury awarded: $100,000 past economic damages, $200,000 past non- economic damages, $150,000 future economic damages, and $250,000 future non-economic damages.

so strong against Mr. Davolt's case that there is no room for reasonable minds to differ, we will not take the case from the jury. *Id.* (quoting *Seitz v. Lemay Bank & Trust Co.,* 959 S.W.2d 458, 461 (Mo. banc 1998)).

■ To determine whether Mr. Davolt made a submissible case, we consider the evidence and all reasonable inferences to be drawn therefrom in a light most favorable to Mr. Davolt while disregarding contrary evidence and inferences. *Poloski,* 68 S.W.3d at 448. However, we will not "supply missing evidence or give [Mr. Davolt] the benefit of unreasonable, speculative, or forced inferences," and the reasonableness of any inferences drawn and the substantiality of the evidence are questions of law. *Id.* at 449.

## II. Submissibility of Mr. Davolt's Case:

■ Dr. Highland attacks Mr. Davolt's proof on the causation element of his medical malpractice claim. As a part of his case, Mr. Davolt was required to prove by substantial evidence that Dr. Highland's negligent act or acts were "both the cause in fact and the proximate or legal cause of [his] injury." *Wright v. Barr,* 62 S.W.3d 509, 524 (Mo.App. W.D.2001). To establish the "cause in fact" prong of causation, Mr. Davolt must have shown that but for Dr. Highland's conduct, his injury would not have occurred; to establish the "proximate cause" prong, he must show that his injury "was the natural and probable consequence of [Dr. Highland's] conduct." *Id.* In his point relied on, Dr. Highland argues there was no substantial evidence of "but for" causation—the "cause in fact" prong—to support submission of the case to the jury, so we limit our review to that issue.

In support of his argument, Dr. Highland contends

that Davolt's expert testified that there is no way to know whether Davolt's previous spinal cord injury was permanent until Highland operated on Davolt and if Davolt's pain and symptoms improved then the previous injury was not permanent but if he did not improve there was no way to know whether the previous injury was permanent or whether the surgery was negligently performed.

Thus, Dr. Highland maintains that "Davolt's case is in essence, a failure to cure and there is no substantial and credible evidence in this case that the October 1991 surgery performed by Highland would have cured Davolt from the symptoms and disabilities he complained of following his injury."

The "sophisticated" nature of Mr. Davolt's injury, which required surgical intervention, necessitated expert medical testimony, to a reasonable degree of medical certainty, to prove causation. *Id.* at 524–25. Dr. Dunn testified as Mr. Davolt's expert medical witness. Dr. Highland argues that Dr. Dunn's testimony is insufficient to support substantial evidence of causation and damages on the part of Mr. Davolt.

More specifically, Dr. Highland argues that the following testimony of Dr. Dunn on cross-examination supports his argument that there was insufficient evidence of "but for" causation:

Q: So, if we had a compression injury, a permanent injury, which apparently we believe exists in this case, do you believe it's a permanent injury, here?

A: Well, I believe it is now, because the pressure was never taken off at the appropriate time. So I believe the injury now is permanent.

Q: All right. But you don't believe it was permanent in—at the time of the surgery.

A: No. I believe Dr. Bohlman's statistics of greater than 90 percent relief.

\* \* \*

Q: ... [B]ack to the proposition of the distinction between the problem of radiculopathy and myelopathy, it is—will you not concede that a permanent injury to the cord could cause the very symptoms that he is experiencing today and was experiencing at the time?

A: Well, the definition you're using, if you say an injury to the cord, is one thing. If you're saying he's had a permanent injury, that means, before anything, it's already permanent.

Q: Right.

A: And you're making a different assumption. That's why I can't concede that to you. If you—if you're saying the ball game [is] already over before it starts, because why do everything if it's already over.

Q: I understand. But what's the criteria for determining whether it's over or not? I mean, when a surgeon is confronted with a problem, they have no way of knowing if the surgery's actually going to repair the situation. The only way to do that is to operate. And it may be permanent, it may not. Isn't that true?

A: That's correct. But if you do—but you have to do it correctly and do it completely, and then you'll find out. If you don't do a complete decompression, you're right back where you started again.

Q: I understand what you're saying. So you feel that Dr. Highland did not do a complete decompression. But I'm interested in whether you would accept the proposition that if he had done a, quote, complete, end quote, decompression, as you describe, and if the patient had not improved, then you would concede that the injury was already perma-

nent. No matter what compression or decompression existed.

A: I'd say it may be already permanent. But if you don't do the decompression correctly, then you'll never know.

Dr. Highland asserts that Dr. Dunn's testimony is rendered insufficient because he failed to testify "that Davolt's injury in July 1991 was the type of injury that the surgery performed by Dr. Highland could have cured Davolt from all disabilities and symptoms that originated from the July 1991 injury." Further, he argues that Dr. Dunn failed to testify how extensively the surgery "should have relieved Davolt's symptoms and disabilities so as to have provided the jury with a basis to determine what symptoms and disabilities would not have existed following the surgery 'but for' the claimed failure to perform a 'complete decompression.' " Likewise, Dr. Highland insists that Dr. Dunn failed to testify "as to the extent to which and nature of any residual disability and complaints Davolt would have had from the original July 1991 injury even had the surgery accomplished a complete decompression."

Dr. Highland likens Dr. Dunn's testimony to that in the cases of *Super v. White*, 18 S.W.3d 511, 516 (Mo.App. W.D.2000), and *Mueller v. Bauer*, 54 S.W.3d 652, 657 (Mo.App. E.D.2001), wherein summary judgments were affirmed because the plaintiffs in both cases failed to prove causation through sufficient medical expert testimony. The experts' testimony in each of those cases was not certain, using terms such as "maybe," "possibly," "could," etc., when asked whether the defendant doctors' allegedly negligent acts or failures to act caused plaintiffs' injuries, which injuries may have resulted from other possible causes. These cases are inapplicable be-

cause we perceive no such conjecture in this case.

■ Dr. Highland isolates a small portion of Dr. Dunn's testimony in an attempt to show the evidence was insufficient to satisfy the submissibility threshold of "but for" causation. However, this court has reviewed Dr. Dunn's testimony in its entirety, and we find that it is sufficient. At one point, Dr. Dunn explained, using Dr. Highland's medical expert Dr. Bohlman's statistics, that "[i]f the procedure is done right, the percentage of a good to excellent result is very high. Better than 90 percent. But if it's not done, in other words, you don't take away the pressure, the success rate is far, far lower." We understand Dr. Highland's argument to advocate the necessity of absolute certainty to support causation by suggesting that because there was a ten percent chance Mr. Davolt's symptoms would have remained, regardless of whether the surgery was done non-negligently, Dr. Dunn's testimony is insufficient to show causation. Such is not the case.

In *Schiles v. Schaefer,* 710 S.W.2d 254, 261 (Mo.App. E.D.1986),[6] a wrongful death action premised upon medical malpractice for failure to diagnose, the plaintiffs' medical experts testified unequivocally that the decedent would not have suffered the embolism that caused his death if the defendants had properly treated him. On cross-examination, one of the plaintiffs' experts testified that a twenty-five percent incidence of embolization exists even when a patient receives the proper treatment. The defendants claimed that this testimony rendered the expert's earlier testimony concerning causation speculative. The Eastern District disagreed, holding that

such acknowledgement of the statistics "did not vitiate his expert opinion. The testimony in this case went beyond percentages, and included unequivocal expert opinions." *Id.* The court explained that the expert's testimony "was not speculative. It was not couched in terms of possibilities; it was instead expressed clearly in terms of *reasonable* medical certainty." *Id.* The expert's citation of statistics "indicate[d] that [the expert] *did* have a scientific basis for his opinion, and his admission that decedent might have died with [the proper treatment] establishes merely that his opinion was based on *reasonable, not absolute medical certainty.*" *Id.*

In *Baker v. Guzon,* 950 S.W.2d 635, 644 (Mo.App. E.D.1997), the Eastern District found that "[i]n light of" the Missouri Supreme Court's holding in *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852 (Mo. banc 1993) "any doubts about the *Wollen* [*v. DePaul Health Center,* 828 S.W.2d 681 (Mo. banc 1992)[7]] Court's rejection of proportional causation or its requirement of 'but for' causation no longer remain." After extensive discussion of the evidence offered in the case, *Baker* relies on *Schiles* in explaining that the plaintiffs' expert's "testimony established that [the defendant's] actions or inaction either 'more probably than not' would cause [the decedent's] death or 'did' cause [her] death," and "[it]was not contradictory" when "taken in the context of [the expert's] direct testimony." *Id.* at 647. After finding that the expert's testimony "successfully established [a causal] link" between the decedent's death and the defendant's negligence, the court explains:

Furthermore, on cross-examination [the plaintiffs' expert] did not vitiate his opinion by responding affirmatively to a sta-

---

**6.** *Schiles* has been questioned and criticized on other grounds not relevant to this opinion.

**7.** *Wollen* has also been subsequently questioned or overruled on other grounds not relevant to this opinion.

tistic, namely, [the decedent's] 'twenty-five per cent chance of dying.' As in *Schiles,* the fact that [the plaintiffs' expert] acknowledged that statistic indicated that there was a scientific basis for his opinion and that his opinion was based on reasonable, not absolute medical certainty.

*Id.* The same is true with regard to Dr. Dunn's acknowledgment of the ten percent chance Mr. Davolt's symptoms would have remained, regardless of whether the surgery was performed non-negligently.

Throughout his testimony, Dr. Dunn repeatedly stated, unequivocally and to a reasonable degree of medical certainty, that Mr. Davolt's ongoing symptoms "were caused by this incomplete decompression [by Dr. Highland] back in October of '91." In fact, immediately after the above-quoted portion of Dr. Dunn's testimony relied upon by Dr. Highland in his argument, defense counsel asked Dr. Dunn, "In terms of, at the time Dr. Highland did his surgery, it's your belief that, had the surgery been in accordance with your view of the standard of care, that all these symptoms would have been relieved, is that correct?" Dr. Dunn replied, unequivocally, "That's correct." On further cross-examination, Dr. Dunn was asked, "Isn't it significant that in the past ten years there hasn't been any increase in his symptoms and he hasn't gotten any worse?" Using the ballgame analogy previously used in his testimony, Dr. Dunn replied, "No, because I think you hit it right off. You denied him the chance to hit a home run going the other way by doing an inadequate decompression."

Viewed in its entirety, Dr. Dunn's testimony may not have been couched in "but for" terminology, but the same message is conveyed. We find that Dr. Dunn's testimony "successfully established [a causal] link" between Mr. Davolt's ongoing symp-toms and Dr. Highland's negligent failure to perform a complete decompression. *Id.*

■ As with many, if not most, medical malpractice cases, this case amounted to a battle of expert witness opinions. Dr. Dunn, as Mr. Davolt's expert, provided substantial evidence of causation through his testimony. Dr. Highland testified in his defense and also presented the expert testimony of Dr. Bohlman. This court will not second-guess whom the jury chooses to believe, as we leave issues of credibility and the weight to be afforded conflicting evidence to the jury. *Id.* at 641.

As previously noted, Dr. Highland does not challenge the sufficiency of the evidence to make a submissible case on the remaining elements of Mr. Davolt's medical malpractice claim. We find that Mr. Davolt made a submissible case of medical malpractice. Thus, the trial court did not err in denying Dr. Highland's motion for directed verdict and motion for JNOV.

Point I is denied.

### Point II: Exclusion of Videotape

In his second point relied on, Dr. Highland contends that the trial court abused its discretion and committed reversible error in denying admission of a videotape of what he claimed to be a demonstration of the surgical procedure at issue.

### I. Standard of Review:

■ We afford the trial court broad discretion in admitting or excluding videotape evidence. *Trageser v. St. Joseph Health Ctr.,* 887 S.W.2d 635, 636 (Mo.App. W.D.1994). The trial court's "exercise of such discretion will not be set aside on appeal unless the injustice of excluding it is substantial and glaring." *Id.* Thus, our focus on review is not whether the videotape was, in fact, admissible; rather we focus on whether "the materiality and pro-

bative value of the evidence were sufficiently clear, and the risk of confusion and prejudice so minimal, that we could say that it was an abuse of discretion to exclude it." *Still v. Ahnemann*, 984 S.W.2d 568, 572 (Mo.App. W.D.1999). In other words, even if the videotape is admissible, we will still affirm if we do not perceive an abuse of discretion in its rejection. This court will find an abuse of judicial discretion:

> "when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable men can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."

*Trageser*, 887 S.W.2d at 636 (quoting *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804 (Mo. banc 1988)).

## II. Trial Court's Exclusion of the Videotape:

After the close of Mr. Davolt's case, out of the presence of the jury, defense counsel informed the court of its intent to introduce Defendant's Exhibit H, the videotape at issue, during Dr. Highland's testimony. Defense counsel described the videotape's contents as an approximately eighteen-minute edited portion of a single-level corpectomy[8] performed by a different doctor, who was a neurosurgeon Dr. Highland knew. He explained that he was

"offering [it] in conjunction with [Dr. Highland's] testimony for purposes of illustration, to give the jury a view of what the field looks like, the use of the instruments." Mr. Davolt's counsel objected to the use of the videotape, arguing, among other things, that the videotape was a "cut" version of a different surgery. He argued that Mr. Davolt's surgery "was a three-hour-and-some-minute surgery that was done on [Mr. Davolt] at two levels, with foraminotomies at some levels, allegedly. I think that, to play for the jury a single-level fusion of a different person, with different anatomy, different presenting symptoms, and a non-negligently performed surgery can only be prejudicial."

The court initially indicated that it would permit the videotape to be viewed upon full explanation to the jury of what it showed and how it differed from the surgery performed on Mr. Davolt. However, after additional objections from Mr. Davolt's counsel, the court viewed the videotape and learned that, despite its pre-trial directive that the entire unedited videotape be given to Mr. Davolt's counsel, he still had not received it. The court "[didn't] understand that that didn't happen." The court then indicated that it would consider admitting the videotape after Mr. Davolt's counsel had a chance to view it, but it was not allowing the videotape to be shown to the jury at that time.

The jury was brought in, and Dr. Highland proceeded to testify. The rest of the afternoon, he described for the jury, with

---

**8.** During the offer of proof, Dr. Highland refers to the surgery on the videotape as "a vertebrectomy of the C5 vertebra and the strut graft from the C4–C6." He explained that the surgery on the videotape was different in that only one vertebra was removed. "Whereas the case in question with Mr. Davolt involved two vertebrae. Other than this, it was a fairly similar type of case." On cross, however, he admitted that the film was edited, with a contiguous time signature although the unedited film did not have such a time signature; that he did not know anything, such as the preoperative anatomy and symptoms as they would relate to Mr. Davolt, about the patient on whom the surgery was performed in the videotape; and that this was a videotape of the removal of a single vertebral body rather than a double like he performed on Mr. Davolt.

the aid of the instruments he used, pictures, diagrams, and various anatomical models, the detailed surgical procedure he performed on Mr. Davolt. Defense counsel then announced that he had "quite a bit more, and [he was] hopeful that counsel, after he sees the full film, might withdraw his objection." Mr. Davolt's counsel responded, "I will have a second objection. I think it would be cumulative. He's already gone through the entire procedure." Defense counsel replied, "He's going to trap me one way or the other. But I'd propose that we stop now and complete this in the morning."

The following morning, before the jury was brought in, defense counsel again requested to allow the jury to view the videotape during Dr. Highland's testimony. The opposing sides argued as follows:

[Mr. Davolt's counsel]: [A]mongst other things, the original of the tape doesn't have a time signature on it. The original of the tape is apparently performed by Dr. Oro, who [ ] is a neurosurgeon and not an orthopedic surgeon. So it's done by a different specialty, on a different person, with a different kind of procedure, using different instruments from what Dr. Highland testified that he uses yesterday, for example.

I don't think it can be anything but prejudicial. I don't believe that it's probative on any issue in dispute. It can only be prejudicial, particularly with a time signature, the reason for which is put on this cut I have no explanation, because it doesn't track the film. The film is cut. The time does not cut. It gives a false impression of a speedy procedure, which I don't think can be fixed by just saying, look, this is a cut film. Why would you put the time signature running on it when it's not in the original, other than to give the false impression that [it] is happening in real

time? And for those reasons, and the fact that I don't believe that it's relevant or probative on any issue before the Court, I would object to it being played to the jury.

[Dr. Highland's counsel]: Your Honor, Dr. Highland will establish by foundation the surgeon who—the procedure that was carried out in this particular case. He's familiar with who did it and has operated with this surgeon.... [He] will identify the procedure as being identical to the type of procedure that's in issue here, other than the fact that it's only one level. He will testify that it fairly and accurately shows the area where the operation was performed: The tissue, the vertebra, the disks as they appeared during the course of the proceeding.

The time align on there was put there I assume by the operator so that you could—go from one time to another, for identification purposes. We intend to make no use of it. And certainly do not intend to represent that Dr. Highland performed this entire operation in 18 minutes. The record reflects the operation took three hours. This in no way has to do with the time of the procedure. It's to demonstrate to the jury the visualization, what the thing looks like.

Now, we can't take them into the operating room. We can't bring pictures of an accident scene. All we can do is use words and pictures and X-rays and, to the best of our ability, to take films that will demonstrate what's going on here. And to deprive us of the opportunity to show the jury what is involved in the surgical procedure would seem to me would be greatly and unfairly prejudicial, particularly when plaintiff's theory is that the doctor, for some reason, failed to recognize and take steps appropriate to decompress the cord and the

nerve roots. And I think the jury's entitled to see what the doctor is working with and have an understanding of that. Otherwise we're just—we're dealing with clean models, without any tissue, without any blood, and I think it would be totally unfair for us to be limited in that respect.

When this argument concluded, the trial court sustained Mr. Davolt's counsel's objection to the admission of the videotape. It later allowed Dr. Highland's counsel to make an offer of proof through Dr. Highland's testimony while the jury deliberated, but it did not change its ruling concerning the videotape's admission.

On appeal, Dr. Highland argues that "[t]he only way to determine the necessary level of decompression was by the way of feel and visualization within the surgical field." He maintains that "[n]ot allowing Highland to even educate or inform the jury on the core issue of visualization by way of the surgical demonstration videotape unduly prejudiced Highland."

■ As noted above, we do not concern ourselves with whether the videotape was or was not admissible; rather, we review the trial court's exclusion of the videotape for abuse of discretion. Although it may have aided Dr. Highland in his explanation of at least part of the procedure he performed on Mr. Davolt, we fail to see how its exclusion worked a "substantial and glaring" injustice. *Trageser*, 887 S.W.2d at 636. Dr. Highland suffered no prejudice in that he was allowed to explain the surgical procedure in graphic detail through the use of various drawings, the instruments he used, and anatomical models,[9] often explaining to the jury what he could visualize while performing the surgery and what he could "feel better than [he could] really visualize." Showing the

videotape to the jury would have been merely cumulative of this testimony. *See Spain v. Brown*, 811 S.W.2d 417, 425 (Mo. App. E.D.1991) (finding that the defendants suffered no prejudice from the exclusion of a physician training videotape that depicted a surgical technique used on the plaintiff that defendants had studied prior to the surgery, because defendants were given the opportunity to fully describe the technique for the jury in graphic detail through the use of anatomical models and to present testimony regarding the contents of the videotape. The court held, among other things, that "defendants suffered no prejudice from the exclusion of the videotape ... [because] showing the videotape to the jury would have been merely cumulative.").

In addition, the trial court could very well have excluded the videotape on various other grounds: First, the videotape had been produced only during trial, and defense counsel did not follow the court's pre-trial directive to provide Mr. Davolt's counsel with the entire unedited version of the videotape until he sought to introduce it during trial. Second, the videotape was an edited version of a less-complex surgery than Dr. Highland performed on Mr. Davolt that was performed by a different doctor, who was a neurosurgeon, not an orthopedic surgeon like Dr. Highland. *See Shoemaker v. Ekunno*, 960 S.W.2d 527, 529–30 (Mo.App. E.D.1998) (finding the trial court did not abuse its discretion in refusing admission of a videotape that portrayed a tubal ligation reversal different from the procedure at issue in the case. The court explained that [i]t would not allow the videotape for three reasons: (1) the plaintiff had not made a specific and definite offer of proof as required; (2) "the videotaped operation depicted a different procedure," and "it [did] not appear that a

---

9. These exhibits are not a part of the record on appeal.

jury would be able to tell that the doctors in the videotape were not intended to depict the events of the [plaintiff's] case, especially since [the plaintiff] proposed to turn off the sound and have the videotape narrated by her medical expert"; and, (3) "the question involved[—whether or not it was impossible to fit a lap sponge into the type of incision used for tubal ligations—][did] not seem beyond the grasp of a normal lay juror."); *see also, Trageser,* 887 S.W.2d at 636–37 (affirming the trial court's refusal to admit a computer-animated videotape that was created to act as a demonstrative aid to show spinal changes similar to that of an actual surgery like the defendant performed on the plaintiff). The third ground upon which the trial court could have chosen to exclude the videotape is that the edited videotape included a time signature that ran continuously, although the film was different cuts from different parts of a different surgery that ran over one and a half hours, which was about half the time of Mr. Davolt's surgery. Accordingly, the court could have found the videotape's prejudicial effect far outweighed any probative value to Dr. Highland in assisting the jury to evaluate his testimony. Overall, we believe reasonable minds can differ about the propriety of the trial court's exclusion of the videotape, so we cannot say that the trial court abused its discretion in so excluding it. *Trageser,* 887 S.W.2d at 636.

Having found no abuse of discretion or prejudice in the trial court's refusal to admit the videotape, we deny Point II.

### Point III: Plaintiff's Expert Witness' Reports

In his third point on appeal, Dr. Highland brings two complaints concerning the trial court's admission of Plaintiff's Exhibits 4 and 5—Dr. Dunn's letters to Mr. Davolt's attorney. First, he complains that the trial court abused its discretion in admitting Dr. Dunn's letters into evidence. Second, he complains that the trial court committed plain error in allowing Dr. Dunn's letters to go to the jury during deliberations.

### I. Admission of Exhibit 5:

We initially consider the admission of "Plaintiff's Exhibit 5," which Dr. Dunn identified at trial as a copy of his report, in letter form, to Mr. Davolt's counsel dated January 29, 1999. Dr. Dunn testified that he generated the report after personally examining Mr. Davolt, "because, if [he] was going to testify as to how [Mr. Davolt] was doing and whether [he] thought these changes were permanent, [he] wanted to say [he] saw [Mr. Davolt], so [he] could tell [Mr. Davolt's counsel] what [he] felt." The trial court admitted Exhibit 5 over Dr. Highland's objection that "it's self-serving." Although he offered this general objection to Exhibit 5 at trial, Dr. Highland did not include his complaints regarding Exhibit 5 in his motion for new trial. Accordingly, this ground for error is not properly preserved for appellate review. Rule 78.07(a)(1); [10] *Foster v. Barnes–Jewish Hosp.,* 44 S.W.3d 432, 439 (Mo.App. E.D.2001). Therefore, we decline to separately review the admission of Exhibit 5 and limit our review to Exhibit 4. Nonetheless, Exhibit 5 contains observations, conclusions, and opinions of Dr. Dunn similar to those found in Exhibit 4, so our analysis below would be applicable to both exhibits. Moreover, although we do not review the propriety of the admission of Exhibit 5, it is considered in our

10. Rule 78.07(a)(1) (2001) provides in relevant part: "In jury tried cases ... [a]llegations of error, other than error relating to the form or language of the judgment, must be included in a motion for a new trial in order to be preserved for appellate review."

subsequent plain error review concerning the trial court's decision to provide Exhibits 4 and 5 to the jury during deliberations.

## II. Admission of Exhibit 4:

We first consider whether the trial court erred in admitting Plaintiff's Exhibit 4. Because the admissibility of evidence lies within the sound discretion of the trial court, there can be no error absent a showing that the court abused its discretion. *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 819 (Mo. banc 2000). In order to show that the trial court abused this discretion, Dr. Highland must show that "the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.*

During Dr. Dunn's testimony, Mr. Davolt offered "Plaintiff's Exhibit 4," which was a report generated by Dr. Dunn on December 15, 1993, at the request of Mr. Davolt's counsel. The report is a letter, addressed to Mr. Davolt's counsel, providing a narrative analysis of Mr. Davolt's medical history. Attached to the report is a cover page listing the records and reports Dr. Dunn reviewed in preparation for his medical evaluation and testimony. The remainder of the report contains his opinions to a reasonable degree of medical certainty as to whether or not Dr. Highland had breached the standard of care in performing Mr. Davolt's surgery. Dr.

Dunn concludes the report with his opinion regarding Dr. Highland's liability.[11]

Dr. Highland's counsel objected to the admission of Exhibit 4 "on the basis of self-serving and hearsay" and that "[i]t's cumulative." The court overruled the objection and said, "Exhibit 4 would [sic] be admitted." Immediately thereafter, as Mr. Davolt began to question Dr. Dunn concerning what he "had the opportunity to review," Dr. Highland's counsel objected again, this time on the grounds that "the report refers to many items that have not been admitted into evidence, may not be admitted into evidence … and, therefore, it contains numerous items and it makes reference to numerous items that may not be admissible." After additional discussion between counsel and the court, Mr. Davolt's counsel clarified for the court that he only wanted to display the cover page of Exhibit 4, which listed the records, reports, and diagnostic examinations relied upon by Dr. Dunn in forming his opinion and writing the report. This page of Exhibit 4 was apparently already being shown to the jury by projection. The following exchange then occurred between Mr. Davolt's counsel and the court:

THE COURT: … We have right before us an objection that has been renewed to Plaintiff's Exhibit 4, which is not—it does contain his opinion. He's free to give his opinion through testimony. That wasn't the issue. The issue was whether or not the report would be admissible.

11. Specifically, Dr. Dunn concludes: "Having reviewed these records and x-ray films, it is my opinion, to a reasonable degree of medical certainty, that Dr. Highland deviated from the accepted standard of care by not thoroughly decompressing the spinal cord and nerve roots, leaving an area of rather severe stenosis at the C5–C6 area. The patient's follow-up films indeed show the stenotic area being present and while there is a central decompression, the area laterally is still impinging on the dural sac and nerve root. As a consequence of this failure, the patient continues to have substantial difficulty, and, as reports from subsequent examiners indicate, any attempt to redo this would be very risky and difficult with no guarantee as to the results because of the fact that it is a redo."

[COUNSEL]: Well, Your Honor, all the report does is identify, at least the cover page, which is before the jury at this point, pursuant to your prior ruling, the documents which the doctor reviewed in forming his opinions. And nothing more. And I—

THE COURT: And that's all you're wanting to display at this time?

[COUNSEL]: At this time.

THE COURT: The objection is overruled.

[COUNSEL]: Thank you, Your Honor.

Once the court overruled the objection after this clarification, Dr. Dunn read from page one of the report only—the list of the items he reviewed in preparation for rendering his opinion. After a number of the listed medical records upon which Dr. Dunn relied in forming his opinion were introduced into evidence without objection, Dr. Dunn proceeded to explain for the jury how he arrived at his opinion in Mr. Davolt's case.

It appears from the record that the jury never saw the remaining pages of Exhibit 4 with Dr. Dunn's analysis and opinion until, as explained below, the jury requested the exhibit during deliberations.[12]

■ **A. Admission of First Page of Exhibit 4:** We first consider the propriety of the trial court's admission of the first page of Exhibit 4, which amounts to a bare listing of the records and reports Dr. Dunn reviewed in his evaluation of Mr. Davolt's case. At trial, Dr. Highland's counsel objected to its admission on the grounds that the report "contain[ed] considerable hearsay information," i.e., reports and records of other doctors who had not been identified and whose qualifications had not been

established or admitted into evidence. Counsel maintained that "an opinion by an expert . . . should not be based on opinions of other experts, but solely on the opinion of the expert that's offered."

Section 490.065.3, governing the admission of expert witness opinion testimony, provides:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

■ In *Peterson v. National Carriers, Inc.,* 972 S.W.2d 349, 354 (Mo.App. W.D. 1998), this court considered the application of section 490.065.3 RSMo 1994.[13] As we explained therein:

> This statute does not prohibit an expert from relying on hearsay. Instead, it recognizes the generally accepted principle that an "expert necessarily acquires his knowledge and expertise from many sources, some of which are inadmissible hearsay. Merely because an expert relied on information and opinions of others does not automatically disqualify his testimony. As long as such sources serve only as a background for his opinion and are not offered as independent substantive evidence . . . he should not be precluded from testifying."

*Id.* (quoting *State ex rel. Mo. Highway & Transp. Comm'n v. Delmar Gardens,* 872 S.W.2d 178, 182 (Mo.App. E.D.1994)).

In our case, Dr. Dunn testified that the records and reports listed on the first page of Exhibit 4 are of the type he reasonably

---

12. It also appears that Exhibit 5 was not displayed to the jury, except during its deliberations.

13. This statute has not been amended and remains the same in RSMo (2000).

relies upon in his practice of orthopedic surgery, and there is no indication in the record that the evidence he relied upon was not reasonably reliable. Thus, we hold that the trial court did not abuse its discretion in allowing this portion of Exhibit 4 into evidence and allowing the jury to view it during trial.

**B. Exclusion of the Remaining Portion of Exhibit 4:** Turning to consideration of the remaining portion of Exhibit 4, we find that the trial court's instinct to limit the use of Exhibit 4 was correct. In fact, that portion of the exhibit containing the doctor's opinions should have been excluded from evidence.

▮▮▮▮ Mr. Davolt sought admission of Exhibit 4 in its entirety under the business record exception to the hearsay rule. Missouri's "Uniform Business Records as Evidence Law," sections 490.660 to 490.690, provides at section 490.680:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence [1] if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and [2] if it was made in the regular course of business, at or near the time of the act, condition or event, and [3] if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

When the enumerated statutory requirements are met, "the statute invests the record with a presumptive verity, and so excepts them from the hearsay rule." *Piva v. Gen. Am. Life Ins. Co.*, 647 S.W.2d 866, 877 (Mo.App. W.D.1983). " '[T]he bottom line' regarding the admissibility of the business records is the discretionary determination by the trial court of their trustworthiness." *Rouse Co. of Mo., Inc. v. Justin's, Inc.*, 883 S.W.2d 525, 530 (Mo. App. E.D.1994).

▮▮▮ This rule is designed to facilitate the admission of documents which experience has demonstrated to be trustworthy. The focus is on the character of the records with consideration for certain earmarks of reliability. Until shown otherwise, the qualified business records are assumed to be accurate because they reflect entries systematically and routinely made by those with a self-interest to ensure accuracy to allow reliance on the records in the regular conduct of business. For example, the motive and purpose for doctors and nurses to make accurate entries in hospital records is to allow the information to be relied on in making critical health decisions.

▮▮▮ Here, the motive and purpose for Dr. Dunn's preparation of Exhibit 4 is different because it was prepared at the request of Mr. Davolt's counsel to assist in the evaluation of the damage and liability issues in the lawsuit. Its " 'primary utility' " was " 'in litigating,' " not for the diagnosis and treatment of Mr. Davolt. *Kitchen v. Wilson*, 335 S.W.2d 38, 43 (Mo.1960) (quoting *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 481, 87 L.Ed. 645 (1943)). The portion of Exhibit 4 offering Dr. Dunn's conclusions and opinions "is not of the character comprehended by the Uniform Law, [so] it is relegated to the status of hearsay and as such is not admissible in evidence." *Id.* Accordingly, it should not have been admitted into evidence. However, the admission of the opinion portion of Exhibit 4 was of no consequence until the jury saw it for the first time during its deliberations. Accordingly, our analysis of Dr. Highland's claim of prejudice begins there.

**III. Allowing the Jury to Have Exhibits 4 and 5 During Deliberations:**

During their deliberations the jury requested that the court provide Dr. Dunn's

written reports. The jury also requested a report from Dr. Bohlman, Dr. Highland's expert, but there was no such report. After discussing the jury's request with counsel for both parties, the court gave Exhibits 4 and 5, in their entirety, to the jury without objection from either party.

**A. Propriety of Giving Exhibits 4 and 5 to the Jury:** Dr. Highland argues that allowing the jury to view the self-serving exhibits during deliberations constituted an improper, undue emphasis of Dr. Dunn's opinion on Dr. Highland's liability, because, in effect, they are a reiteration of Dr. Dunn's testimony, allowing Mr. Davolt an unfair advantage with the jury. Dr. Highland likens the exhibits to those "testimonial" in nature, such as depositions and trial testimony, which cannot be re-read or given to the jury during deliberations. *O'Neal v. Pipes Enters., Inc.*, 930 S.W.2d 416, 421 (Mo.App. W.D. 1995). The concern is that repetition of a portion of testimony would encourage the jury to emphasize that testimony over all the other testimony, "which in turn 'might lead to interminable confusion or to an unwarranted advantage to one party over the other.'" *Id.* (quoting *Isreal v. Fanchon & Marco*, 58 S.W.2d 774, 778 (Mo. App.1933)).

Dr. Highland cites no authority for his assertion that the opinion portion of Dr. Dunn's letters was a testimonial exhibit of the nature described in *O'Neal.* However, we have already said that the opinion portion should not have been admitted. It follows that this type of letter should not then go to the jury during deliberations.

**■ B. Review for Plain Error:** But, Dr. Highland concedes that he did not object to the exhibits being provided to the jury during deliberations after they were requested; therefore, he is limited to seeking plain error review under Rule 84.13(c), which provides: "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." [14]

■ Appellate courts rarely grant plain error review in civil cases, as the rule "'should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review.'" *Messina v. Prather*, 42 S.W.3d 753, 763 (Mo.App. W.D.2001) (quoting *State v. Valentine*, 646 S.W.2d 729, 731 (Mo.1983)). The propriety of granting plain error review is fact-specific. *Id.*

■ Dr. Highland urges us to find that, because Dr. Dunn's reports sent to the jury room were testimonial in nature, Mr. Davolt's expert's opinion was given prejudicially unfair and improper weight. Even though the reports offered the jury no new information, we agree that the reports reiterated Dr. Dunn's opinions, which he had already testified to on the stand. However, even if we were to agree the error was prejudicial, "*plain error* and *prejudicial error* are not synonymous terms." *State v. Reed*, 21 S.W.3d 44, 47 (Mo.App. S.D.2000) (citing *Valentine*, 646 S.W.2d at 731). Accordingly, not every prejudicial error will be deemed "plain"

---

14. Missouri Rule of Civil Procedure 84.13(c) governs plain error review of civil cases, while Missouri Rule of Criminal Procedure 30.20 governs plain error review of criminal cases. They are substantially similar such that cases construing one may be equally applicable to plain error review under the other. *See, e.g., State ex rel. Boling v. Malone*, 952 S.W.2d 308, 311 n. 4 (Mo.App. W.D.1997) (applying a criminal case's analysis of plain error review in a civil case).

error. *Messina*, 42 S.W.3d at 763. This is because "[t]he assertion of plain error places a much greater burden on a [party] than [an assertion of] prejudicial error." *State v. Hunn*, 821 S.W.2d 866, 869 (Mo. App. E.D.1991). We will reverse the trial court "only if we find that a 'manifest injustice or miscarriage of justice has resulted.' " *Nelson v. Waxman*, 9 S.W.3d 601, 605 (Mo. banc 2000) (quoting Rule 84.13(c)). Manifest injustice depends on the facts and circumstances of the particular case, and Dr. Highland bears the burden of establishing manifest injustice amounting to plain error. *State v. Zindel*, 918 S.W.2d 239, 241 (Mo. banc 1996).

 Even assuming Exhibits 4 and 5, Dr. Dunn's reports, are of the same nature as testimonial exhibits, allowing a deliberating jury to view testimonial evidence is not automatically manifest injustice. *See, e.g., State v. Silas*, 885 S.W.2d 716, 721–22 (Mo.App. W.D.1994) (finding defendant's claim that the playing during deliberations of his cousin's videotaped statement, which had been admitted as substantive evidence and was therefore testimonial in nature, "unduly emphasized the statement and impermissibly bolstered the state's case," did not constitute plain error); *see also Reed*, 21 S.W.3d at 48 (finding, after a plain error analysis, that giving a testimonial exhibit, which was a transcript of the preliminary hearing, to the jury while it deliberated did not "so substantially affect[ ] Defendant's rights that a manifest injustice or miscarriage of justice inexorably result[ed] if left uncorrected," even though the exhibit included not only testimony of a dead witness but also the court's finding of probable cause to believe the defendant committed the crimes).

We believe that to constitute a manifest injustice or miscarriage of justice the error should weaken the very foundation of the process and seriously undermine confidence in the outcome of the case. Based on a consideration of the facts and circumstances of this case, we find no such plain error and deny Dr. Highland's Point III.

### Point IV: Future Periodic Payments

In his fourth and final point on appeal, Dr. Highland contends that the trial court abused its discretion and misapplied the law in computing periodic payments of future damages under section 538.220.

Prior to the case being submitted to the jury for deliberations, Dr. Highland filed a motion pursuant to section 538.220, in which he requested that if the jury awarded future damages in excess of $100,000, the trial court require that future damages be paid in whole or in part in periodic or installment payments. The trial court's initial judgment was entered subject to the adjudication of the parties' agreement upon periodic payments, if any, of the future damages. The parties later agreed that an amendment to the judgment was necessary to reflect periodic payments under section 538.220 with regard to the $400,000 future damage award, after a reduction for attorneys' fees and expenses. Specifically, in their suggestions in support of an amended judgment, the parties agreed:

(1) that payment of the future damages portion subject to periodic payments were to be made in five annual equal installments, with payments beginning July 1, 2002, and ending July 1, 2006;

(2) that future periodic payments should accrue interest from July 13, 2001, at the rate of 6% per annum until paid; and,

(3) that the portion of the judgment subject to periodic payments should be reduced by attorneys' fees payable on the future damages as well as the pro

rata actual costs incurred by plaintiff in the prosecution of the action.

The parties also stipulated that "plaintiff's attorneys['] fees at this point [are] 40% of the amount recovered, but should defendant file a Notice of Appeal, plaintiff's attorneys' fees will become 50%" and that "plaintiff's actual advanced costs in this action total $30,172.22." However, the parties disagreed on the aggregate sum subject to the periodic payments, and each proposed his own formula in his suggestions. Dr. Highland submitted that, after a pro rata reduction for attorneys' fees and costs, the entire remaining amount of future damages should be subject to periodic payments, resulting in an aggregate sum of $222,747.59 subject to future periodic payments. Mr. Davolt, relying on *Baker*, 950 S.W.2d at 648, argued that only the amount of future damages in excess of $100,000 was subject to periodic payments, resulting in an aggregate sum of $122,747.59 subject to future periodic payments.

On October 15, 2001, the trial court entered its amended judgment, reflecting the periodic payments requested by Dr. Highland as follows:

> Payment shall be (a) $577,252.41 together with interest thereon at the Missouri judgment rate from July 13, 2001, (b) taxable costs with interest thereon at the Missouri judgment rate from July 13, 2001, together with (c) the sum of $122,747.59 to be paid in five annual installments beginning the first day of July, 2002 and concluding on the first day of July, 2006, together with interest thereon at the rate of 6% from July 13, 2001.

Whether the trial court erred in making only the future damages exceeding $100,000 subject to periodic payments, as alleged by Dr. Highland, is first an issue of statutory interpretation, which involves well-settled principles that require us to ascertain the legislative intent from the language of section 538.220. As this court recently explained:

> In interpreting a statute, our primary goal is to determine "the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." Where the language of the statute is clear and unambiguous, there is no room for construction. "To determine whether a statute is clear and unambiguous, this court looks to whether the language is plain and clear to a person of ordinary intelligence." "Only when the language is ambiguous or if its plain meaning would lead to an illogical result will the court look past the plain and ordinary meaning of a statute."

*Long v. Interstate Ready–Mix, L.L.C.*, 83 S.W.3d 571, 576 (Mo.App. W.D.2002) (citations omitted).

Section 538.220.2, provides in relevant part:

> At the request of any party to such action made prior to the entry of judgment, the court shall include in the judgment a requirement that future damages be paid in whole or in part in periodic or installment payments *if the total award of damages in the action exceeds one hundred thousand dollars.* Any judgment ordering such periodic or installment payments shall specify the recipient, the amount of each payment, the interval between payments, and the number of payments. The parties shall be afforded the opportunity to agree on the manner of payment of future damages, including the rate of interest, if any, to be applied, subject to court approval. However, in the event the parties cannot agree, the unresolved issues shall be submitted to the court for reso-

lution, either with or without a post-trial evidentiary hearing which may be called at the request of any party or the court.

(Emphasis added.) At issue is the meaning or purpose of the italicized portion of this statute.

■ We have carefully considered the plain and ordinary language of section 538.220.2, and we agree with Dr. Highland that the statute clearly and unambiguously dictates that the $100,000 is a statutorily required minimum or threshold amount as to the entire judgment that must be met before periodic payments may be ordered for future damages. In other words, if the entire judgment in the action exceeds $100,000, and proper procedure has been followed, then future damages are subject to periodic payments. We do not interpret it, as Mr. Davolt does, to mean that only future damages exceeding $100,000 are subject to periodic payments. Despite Mr. Davolt's contentions to the contrary, the *Baker* case does not hold that the statute requires $100,000 to be automatically deducted from the award of future damages in determining future periodic payments. Indeed, in discussing the defendant's third point on appeal, *Baker* does state that, in addition to alleged errors in deducting attorneys' fees and expenses from the future damages award, the defendant contended "that the trial court erred in finding that, under section 538.220.2, only that portion of the future damages award of $527,100 exceeding $100,000 and payable to an individual plaintiff was subject to periodic payments...." 950 S.W.2d at 648. But, the court did not address the propriety of a "portion of the future damages award ... exceeding $100,000"; rather, the court narrowed its focus and found only that the court did not err in ordering that only husband receive the two periodic payments. *Id.* The *Baker* court never reached the ultimate issue now before us.

■ Although we agree with Dr. Highland that the "amount exceeding $100,000" portion of the statute is merely a threshold amount, this does not mean that reversal is required.

In *Vincent by Vincent v. Johnson*, 833 S.W.2d 859, 866 (Mo. banc 1992), the Missouri Supreme Court construed the language of section 538.220.2 as "a general grant of equity powers to the circuit court." The court further explained:

The circuit court is, thus, entitled to fashion relief in the best interests of the parties, subject to review only on the basis of its arbitrariness. The statute does not require but authorizes an evidentiary hearing at the request of either party or sua sponte and does not give any guidance on how such future payments are to be structured.

*Id.* Except for all past damages, which must be paid in a lump sum at the time of the judgment, section 538.220.1, and attorneys' contingent fees to be paid at the time of judgment, section 538.220.4, in the absence of a court-approved agreement between the parties, the statute grants the trial court broad discretion in establishing a plan for periodic payment of future damages. *Id.* While section 538.220.2 directs that, "if the total award of damages in the action exceeds one hundred thousand dollars," the trial court "shall" include in its judgment the requirement that future damages be paid in periodic or installment payments, the statute explicitly allows the court to order that future damages be paid "in whole *or in part.*" (Emphasis added.) Thus, once the threshold of $100,000 in damages has been met, the trial court has the discretion to determine what portion of the future damages award must be paid in periodic or installment payments. Here, the court determined that all but $100,000 of the jury's future damages award would be subject to periodic payments. Of

course we recognize that $100,000 is also the statutory threshold amount. However, there is nothing in the record before us to indicate the trial court misapplied the law rather than just exercising its discretion to make "whole *or part*" of the future damages award subject to future periodic payments according to the statute. We decline to speculate.

Under section 538.220.2, the amount to be paid in periodic or installment payments is discretionary. We perceive no abuse of discretion in the trial court's determination that all but $100,000 of the jury's future damages award would be subject to periodic payments. Accordingly, Point IV is denied.

### Conclusion

For the foregoing reasons, we affirm the trial court's judgment.

BRECKENRIDGE, P.J., and HOLLIGER, J., concur.