**John VERBRUGGE, Plaintiff–Appellant,**

**v.**

**ABC SEAMLESS STEEL SIDING, INC., and ABC Seamless, Inc., Defendants–Respondents.**

No. 26169.

Missouri Court of Appeals, Southern District, Division One.

Jan. 31, 2005.

Petition for Rehearing and Transfer Denied Feb. 22, 2005.

Application for Transfer Denied April 5, 2005.

J. Patrick Sullivan, Sullivan Law Office, P.C., Branson West, MO, for Appellant.

Gail L. Fredrick, Douglas C. Fredrick, Fredrick, Rogers & Vaughn, P.C., Springfield, MO, for Respondent ABC Seamless Steel Siding, Inc.

Randy R. Cowherd, Lucas C. Smith, Haden, Cowherd, Bullock & McGinnis, L.L.C., Springfield, John Cowherd, Mount Vernon, MO, for Respondent ABC Seamless, Inc., a/k/a ABC, Inc.

JAMES K. PREWITT, Judge.

John Verbrugge appeals from a judgment finding in favor of ABC Seamless Steel Siding, Inc. ("Franchisee") and ABC Seamless, Inc. ("ABC") on claims of breach of contract and warranty, respectively. The trial court found that Verbrugge's claim of damages and breach of contract against Franchisee was time-barred and that his claim of damages and breach of warranty against ABC must be denied because there was no credible evidence that ABC had breached any express or implied warranty, regardless of its affirmative defense that the claims against it were time-barred.[1]

### Facts

ABC Seamless Siding & Windows, Inc. ("Original Franchisee") was a franchisee of ABC and located in Springfield, Missouri. On November 23, 1993, Verbrugge entered into a contract with Original Franchisee to install seamless siding, soffits, fascia, vents, guttering, and downspouts on Ver-

---

1. In its Answer to Petition in Damages, Respondent ABC Seamless, Inc. states that its proper corporate name is "ABC, Inc."

brugge's home. The total contract price was $10,744, and Verbrugee paid a down payment of $1,744 to Original Franchisee at the time the contract was signed.

In April of 1994, the ABC franchise was transferred from the Original Franchisee to Franchisee, a company owned by Jim Little, located in Nixa, Missouri. The installation, which took place in March and April of 1994, was completed by Franchisee. There was no dispute that Little's company, Franchisee, hired the installers for the work on Verbrugge's home and that the $9,000 balance on the contract was paid to Franchisee. Franchisee "did the work for the other corporation." [2]

At or around the time the installation work was completed and final payment made, Verbrugge received two warranty documents. Both warranties listed March 4, 1994, as the installation date. The first warranty was a "Lifetime Transferable Non–Prorated Limited Warranty," a warranty on the materials installed, which was signed by Gerald Beyers as president of ABC. The warranty contained a statement that "[t]he Manufacturer does not warrant installation nor defects caused by installation." The second warranty was an "Exclusive Twenty Year 100% Labor Warranty," which listed only Franchisee at the Nixa address and was not signed by any officer of ABC.

The work on Verbrugge's home was completed on or about April 2, 1994, and on or about April 7, 1994, Verbrugge notified Little of defects in materials and/or defects in the workmanship. Verbrugge sent Little a written communication listing eight to ten complaints, one of which was that a ladder or scaffolding had fallen against the side of the house causing a dent in the siding. Little had the dented area replaced with new paneling. Little hired someone to address Verbrugge's complaints over a three-day period, after which Little thought Verbrugge was satisfied.

According to Verbrugge, less than a month after the completion of the installation, he also started noticing leaks. After consulting with "a group of building professionals[,]" Verbrugge determined that the leaks were caused by the manner in which a J-channel was installed. "[T]he siding goes up against the J-channel to help hold it." The J-channel also functions to hide the siding and aid in water runoff, but the channel allegedly was installed in such a way that water would run directly into the house, causing flooding in the basement. Verbrugge later installed new doors, put in his own J-channel, and began an "every three month" caulking schedule for the windows, which alleviated the leaking. Verbrugge also complained to Little that the fascia was "very wavy." However, that was something Verbrugge decided to "liv[e] with."

In addition to the written communication to Little in April, 1994, there were other communications between Verbrugge and Little, including various phone calls, and a letter dated May 20, 1994. This letter outlined what actions, according to Verbrugge, Little and Little's employees had or had not taken with respect to the alleged damages noted above. The May, 1994 letter threatened legal action if Little did not "fix [Verbrugge's] siding within 14 days of receipt of this letter."

Verbrugge later encountered problems with the gutters; instead of the water going into a downspout, the gutters would overflow. The weight and stress eventually led to a collapse of a portion of the gutter system. Verbrugge noticed the

---

**2.** Franchisee was organized in April, 1994. Jim Little had had an ownership interest and had been a silent partner in Original Franchisee, but Franchisee was "his company."

problems with the gutters "developing over time." He noted in a letter to Little dated April 23, 1995, that he had "discovered the rain gutters were improperly installed [and] ... [ran] uphill, away from the downspouts." According to Verbrugge, however, he "knew about the dent, the guttering, the fascia and the leaking in April of 1994[.]"

Little did not recall receiving the April, 1995 letter and indicated that that period of time was "about the time we closed the company[.]" According to Verbrugge, since Little could no longer be contacted because he "was out of business," Verbrugge decided to contact Beyers, the president of ABC.

The first time Verbrugge contacted ABC was in 1997. Verbrugge phoned Beyers in July, 1997, and followed up with a letter dated August 4, 1997. Verbrugge's phone call and letter to ABC was ABC's only notification of Verbrugge's dispute with Franchisee, as Little indicated that he never contacted ABC. Verbrugge testified that his complaints related only to "the installation work done by the franchisee's employees, not with the quality of the materials, and that he was not claiming that any of the materials provided by ABC were defective."

Verbrugge filed a petition in damages against Franchisee and ABC on July 14, 1999. The two-count petition included a breach-of-contract claim against Franchisee and a breach-of warranty claim against ABC. In its answer, ABC raised several affirmative defenses, including that the claims against it were barred by a four-year statute of limitations and that ABC did not warrant the workmanship or labor performed by Franchisee. Franchisee also filed an answer and was later granted leave to amend that answer to assert affirmative defenses, which included that the

claims were barred by two separate statutes of limitations.

The trial court denied a motion for summary judgment filed by ABC, and the matter proceeded to trial. In its judgment entered February 3, 2004, the trial court found in favor of Franchisee and ABC on Verbrugge's claims of breach of contract and warranty, respectively. The trial court found that Verbrugge's claim of damages and breach of contract against Franchisee was time-barred and that his claim of damages and breach of warranty against ABC must be denied because there was no credible evidence that ABC had breached any express or implied warranty, regardless of its affirmative defense that the claims against it were timebarred.

This appeal followed.

### Discussion

Verbrugge raises two points in his appeal, which we will address in order.

*Point I—Claim against Franchisee barred by § 516.120, RSMo 2000*

In his first point, Verbrugge argues that the trial court erred in its determination that the breach-of-contract claim against Franchisee was barred by the five-year statute of limitations stated in § 516.120, RSMo 2000. According to Verbrugge, the damages were not "capable of ascertainment" until 1997, when the last item of damage, the collapse of the guttering, occurred.

Verbrugge asks that we consider both § 516.100, RSMo 2000, and § 516.120, RSMo 2000 in our review. Section 516.100, RSMo 2000, indicates the period of limitation prescribed and states:

Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued;

provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Under § 516.120, RSMo 2000, among the actions that shall be commenced within five years are those actions "upon contracts[.]" § 516.120(1), RSMo 2000.[3]

As this was a non-jury trial, our review is under Rule 73.01. *Oliver v. Blackwell,* 2 S.W.3d 160, 160 (Mo.App.1999). That rule requires that the trial court's judgment be sustained, unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *In re Marriage of Lafferty,* 788 S.W.2d 359, 361 (Mo.App.1990).

▬▬ Under Missouri law, the applicable statute of limitations does not commence until the fact of damage is ascertainable. *Birdsong v. Christians,* 6 S.W.3d 218, 229 (Mo.App.1999). However, the fact of damage may be ascertainable "even if the exact amount of damage cannot be verified or if some additional damage may arise at a future time." *Id.* The term "capable of ascertainment" has been interpreted to signify "the moment plaintiff's damages are substantially complete." *Business Men's Assur. Co. of America v.*

*Graham,* 984 S.W.2d 501, 507 (Mo.banc 1999) (internal citation omitted).

Verbrugge testified that a gutter collapsing and "hanging down in front of [a] window .... was one of the last straws ... [that led to him] to decide to file the lawsuit." Verbrugge also testified that he "knew about the dent, the guttering, the fascia and the leaking in April of 1994[.]"

In his brief and in oral argument by his counsel, Verbrugge appears to primarily rely upon *Linn Reorganized School Dist. No. 2 of Osage County v. Butler Mfg. Co.,* 672 S.W.2d 340 (Mo.banc 1984). We agree that the analysis of § 516.100 therein contained is controlling and gives merit to Point I. *Linn Reorganized School Dist.* quotes from *Davis v. Laclede Gas Co.,* 603 S.W.2d 554, 556 (Mo.banc 1980), which appears to adopt the view articulated in *Developments in the Law—Statutes of Limitation,* 63 Harv.L.Rev. 1177, 1205 (1950), that Missouri's "capable of ascertainment" language recognizes that the limitations period does not commence from technical breach but from the existence of a practical remedy. *Linn Reorganized School Dist.,* 672 S.W.2d at 343.[4]

Thereafter, the *Linn Reorganized School Dist.* court concludes that under the circumstances of that case:

[I]f the wrong done is of such a character that it may be said that all of the damages, past and future, are capable of ascertainment in a single action so that the entire damage accrues in the first instance, the statute of limitation begins to run from that time. If, on the other

---

**3.** Franchisee had also raised the affirmative defense that the claims against it were time barred under § 400.2–725, RSMo 2000, which states a four-year statute of limitations in contracts for sale. The trial court determined that this was a contract action covered by § 516.120, RSMo 2000, and that determination is not challenged on appeal.

**4.** Although not an issue here, *Linn Reorganized School Dist.* also notes that in a contract case, the limitations period does not start until time for correction of defects has passed. 672 S.W.2d at 344. *See also Loeffler v. City of O'Fallon,* 71 S.W.3d 638 (Mo.App.2002).

hand, the wrong may be said to continue from day to day, and to create a fresh injury from day to day, and the wrong is capable of being terminated, a right of action exists for the damages suffered within the statutory period immediately preceding suit.

*Id.*

As a practical matter, the full extent of the damages could not have been ascertained until the collapse of the guttering, which occurred in 1997. That something may happen does not mean it will.

■ Although the "ascertainment" of when there is more than one item of damages under § 516.100 has created confusion, we believe its purpose was to prevent a party from having to file suit before there could be a practical determination of the extent of damages. To deny Verbrugge's claim may force others in similar situations to bring premature actions which might not be necessary or create disputes as to future occurrences which may or may not occur. The past is often difficult to ascertain, much less the future. We hold that on these facts, as a matter of law, Vergrugge's claim is not time-barred. Point I has merit.

As it may be relevant upon any re-trial, we proceed to discuss the issues presented in Point II.

*Point II—Ambiguity of warranties*

■ In his second point, Verbrugge contends that the trial court erred in denying the breach-of-warranty claim against ABC. According to Verbrugge, ABC did have responsibility under the labor and workmanship warranty because both that warranty and the materials warranty were ambiguous and, therefore, should be construed against the maker.

Our general standard of review is as stated in Point I, that we will sustain the trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Lafferty*, 788 S.W.2d at 361.

■■ We can find nowhere in the record that the issue of any alleged ambiguity of the warranties was before the trial court. In general, an issue not advanced before the trial court is not preserved for appellate review. *Scism v. Scism*, 844 S.W.2d 506, 507 (Mo.App.1992). Appellate courts rarely grant plain-error review in civil cases. *Davolt v. Highland*, 119 S.W.3d 118, 135 (Mo.App.2003). We reserve such review for cases in which hatred, passion or prejudice has been produced, resulting in a manifest injustice or miscarriage of justice. *Buatte v. Schnuck Mkts., Inc.*, 98 S.W.3d 569, 573 (Mo.App. 2002).

■ Even under a gratuitous plain-error review here, we cannot find that the trial court erred. We agree with the trial court that there was substantial evidence to show that the only warranty applicable to ABC was the first one in which it provided a warranty on the materials installed. Little testified that ABC's only role in the business was to supply material. ABC did nothing else; it provided no labor and no machinery. Thus, the second warranty, the one under which a warranty was provided for labor and workmanship, related to Franchisee and not to ABC, as was indicated on the warranty itself where only the Franchisee's name, address and phone number were listed. Further, the first warranty, which was signed by Beyers, as president of ABC, did appropriately disclaim any warranty of ABC as manufacturer of the installation or any defects caused by installation. *See Karr–Bick Kitchens & Bath, Inc. v. Gemini Coatings, Inc.*, 932 S.W.2d 877, 879 (Mo.App.1996).

Point II is denied.

## Conclusion

The judgment as to the issues presented in Point II is affirmed. Otherwise, the judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

GARRISON, P.J., and RAHMEYER, J., concur.